**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
**ISAAC HARRIS, et al.,**                               )
                                                        )
    **Plaintiffs,**                  )
                                                        )
      **v.**                )     **Case No. 17-cv-01371 (APM)**
                                                        )
**MEDICAL TRANSPORTATION**                              )
**MANAGEMENT, INC.,**                                   )
                                                        )
    **Defendant.**                   )
_____        )

## MEMORANDUM OPINION AND ORDER

This case concerns drivers who claim that they have not been paid in accordance with federal and local wage laws for transporting Medicaid patients in the District of Columbia. Defendant Medical Transportation Management, Inc., is a private company that contracts with the District of Columbia to "manage and administer" non-emergency transportation services for Medicaid recipients. Defendant does not itself supply these transportation services; rather, it contracts with various companies that own vehicles and employ drivers for that purpose. Defendant considers itself a "broker" of transportation services.

Plaintiffs Isaac Harris, Darnell Frye, and Leo Franklin work as drivers for companies that contract with Defendant to provide transportation services. They bring this class action to recover wages that they allege their employers have not paid them and similarly situated drivers. Plaintiffs contend that, even though Defendant is not their "employer" in the ordinary sense of that word, Defendant is legally liable for their unpaid wages as a "joint employer" or "general contractor" under federal and local laws. Plaintiffs' claims arise under four federal and District of Columbia wage statutes: (1) the Fair Labor Standards Act, (2) the D.C. Minimum Wage Act, (3) the

D.C. Living Wage Act, and (4) the D.C. Wage Payment and Collection Law.  Plaintiffs also advance a common law breach-of-contract claim on the theory that they are third-party beneficiaries of the contract between Defendant and the District of Columbia, which requires Defendant and transportation companies to pay no less than the current living wage.

Defendant seeks dismissal of Plaintiffs' claims in their entirety.  In its Motion to Dismiss, Defendant argues that: (1) it cannot be held liable for the alleged wage violations because it is neither a "joint employer" nor "general contractor" under the relevant wage laws; (2) Plaintiffs' line of work is exempted from the D.C. Living Wage Act; and (3) Plaintiffs are not third-party beneficiaries of the contract between Defendant and the District of Columbia and, therefore, do not have standing to enforce it.

For the reasons that follow, Defendant's Motion to Dismiss is granted as to the breach of contract claim, but denied as to the federal and District of Columbia wage claims.

## I.  BACKGROUND

### A.  Factual Background

Federal Medicaid regulations provide that a state Medicaid plan must: "(a) [s]pecify that the [state] Medicaid agency will ensure necessary transportation for beneficiaries to and from providers; and (b) [d]escribe the methods that the agency will use to meet this requirement." 42 C.F.R. § 431.53.  Under its Medicaid State Plan, the District of Columbia uses both public and private transportation options to ensure that benefits recipients are able to get to and from providers.  Depending on the circumstances, recipients may receive bus tokens, Metro fare cards, taxicab vouchers, medi-van or other van transportation, or non-emergency ambulance services to meet their transportation needs.[1]

---

[1] D.C. Medicaid State Plan, Section 3.1(c)(1) & Attachment 3.1D (available at https://dhcf.dc.gov/page/medicaid-state-plan).

2

The District of Columbia does not deliver transportation services directly to Medicaid patients. Rather, it uses a "transportation broker system" to "effectively and efficiently administer [non-emergency transportation] services." *See generally* Def.'s Motion to Dismiss, ECF No. 10, Ex. 2, ECF No. 10-2 [hereinafter "Contract"], ¶ C.4.3.3.; *see also* Compl., ECF No. 1, ¶¶ 22–24. To that end, the District of Columbia has contracted with Defendant Medical Transportation Management, Inc., to "manage and administer" the District's transportation broker system. Contract ¶ C.5. The District first contracted with Defendant around 2007, and during the last decade the parties have entered into new agreements or extensions multiple times. *See* Compl. ¶¶ 22–24. The most recent contract—a three-year, $85 million contract—took effect in December 2015. *See id*. at 24; *see generally* Contract. The court refers to this most recent contract when referencing the agreement's terms.

Per the agreement, Defendant is required to serve as the "Gatekeeper of transportation service requests" from Medicaid recipients. Contract ¶ C.1(c). Defendant is required to create and operate a call center to receive and process patients' transportation requests. *Id.* ¶ C.1(b). Defendant must validate a recipient's eligibility and assess the medical necessity of the requested transportation, *id.*, and upon doing so, determine the "most Appropriate Mode of Transportation," which may include public transportation, *id.* ¶ C.1(d). Additionally, Defendant must establish "a Comprehensive Transportation Network offering [a] number and variety of transportation providers to meet the needs of Recipients." *Id.* ¶ C.1(a). This includes contracting with privately-owned transportation companies of the kind that employ Plaintiffs in this case. *See* Compl. ¶¶ 18–19, 26. The Contract specifically bars Defendant from "own[ing] or operat[ing] any vehicle to be used for transport with the NET program," Contract ¶ C.5.1.5; *see also* Compl. ¶¶ 25, and federal regulations are to the same effect, 42 C.F.R. § 440.170(a)(4)(ii)(A).

Plaintiffs Isaac Harris, Darnell Frye, and Leo Franklin are current or former drivers for companies that provide non-emergency medical transportation services to Medicaid patients in the District of Columbia.  Compl. ¶¶ 1, 21; *see id*. ¶¶ 49, 62, 67, 78, 89.  All of their employers have agreements with Defendant to provide such services.  *Id*. ¶ 22; *see also id*. ¶¶ 18, 26–28.  According to Plaintiffs, although Defendant is not their direct employer, Defendant controls their "daily operations."  *Id.*  ¶ 27.  Specifically, they allege that Defendant has the authority to exercise control over the transportation provider in various ways, "including hiring and firing [of providers' employees], the terms and conditions of employment and employees' daily responsibilities, payment of wages, and record retention relating to the employees."  *Id*.  Defendant's alleged control manifests itself in a multitude of ways.  For example, Defendant "required" Plaintiffs to pass background checks and drug tests as a prerequisite to being hired as drivers.  *Id*. ¶¶ 50, 68, 79; *see also id*. ¶ 34(c).  Defendant also sets minimum qualifications for drivers, including that they must be at least 21 years old, speak English, and be physically capable of assisting patients. *Id*. ¶ 34(c).  Once hired, Plaintiffs and all other drivers were required to complete a training administered by Defendant and held at its offices.  *Id*. ¶¶ 51, 69, 80; *see also id*. ¶ 34(b).  Some Plaintiffs even had to complete retraining during their employment in order to retain their positions.  *See, e.g., id*. ¶¶ 69, 80.  Defendant also requires providers to share copies of drivers' personnel records, and Defendant, in turn, maintains its own personnel files containing drivers' records.  *See id*. ¶ 38.  In addition, Defendant requires the transportation providers to ensure drivers are both insured *and* that Defendant is listed as an "Additional Insured" on their policies.  *Id*. ¶ 37. Defendant also imposes upon drivers standards of conduct.  *See id*. ¶ 82.

The Contract also contains a wage provision.  It requires Defendant to "comply with the most recent and future revisions of all federal and District of Columbia laws," and names the

D.C. Living Wage Act as one of the laws by which Defendant must abide. *Id*. ¶¶ 39–40; *see also* Contract ¶¶ C.2, H.8.1, H.8.7–H.8.9.

Plaintiffs allege that they have not been compensated consistent with federal and state wage laws. In all of their driving positions—collectively, they have worked for four different transportation companies—each Plaintiff worked 40-plus hour work-weeks for a fixed rate, regardless of the number of hours he worked. *E.g. Id*. ¶ 54–56 (alleging that Harris's "effective hourly wage" was approximately $7.12); *id*. ¶ 72–74 (alleging that Frye's "effective hourly wage" was about $4.79); *id*. ¶¶ 88–90 (alleging that Franklin's "effective hourly wage" ranged between $5 and $8.18 when working for one transportation provider, and between $3.61 to $8.63 when driving for another company). Plaintiffs did not receive time-and-a-half for their overtime hours. *E.g.*, *id*. ¶¶ 55, 57 (alleging that Harris was paid a $463 a week by Star Transportation, even though he regularly worked 65-hour work weeks); *id*. ¶¶ 63–64 (alleging that Harris received a "flat rate of $1200.33 biweekly" for weeks in which he worked more than 40 hours while driving for a transportation provider); *id*. ¶¶ 72–75 (alleging Plaintiff Frye received $350 a week while driving for a transportation provider, despite working an average of 73 hours a week); *id*. ¶¶ 85–87, 90 (alleging that Franklin was paid between $325 to $475 a week while working for a transportation provider, even though he worked between 55 and 90 hours a week). As a result, Plaintiffs claim they, and other similarly situated drivers, were grossly underpaid.

### B.    Procedural History

On July 13, 2017, Plaintiffs filed a five-count class action against Defendant. *See generally* Compl. In Count One, they allege that Defendant violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., by failing to pay Plaintiffs the minimum wage and overtime rates required by the law. Compl. ¶¶ 124–32. Counts Two, Three, and Four respectively allege that Defendant violated

the D.C. Minimum Wage Act, D.C. Code § 32-1001 *et seq.*; the D.C. Living Wage Act, D.C. § 2-220.01 *et seq.*; and the D.C. Wage Payment and Collection Law, D.C. Code § 32-1301 *et seq.* Compl. ¶¶ 133–162.  Finally, Count Five alleges that Defendant breached its contract with the District of Columbia by violating the Living Wage Act.  *Id.* ¶¶ 163–69.

Defendant responded with a Motion to Dismiss on August 31, 2017.  *See generally* Def.'s Mot. to Dismiss, ECF No. 10 [hereinafter Def.'s Mot.].  The court held argument on Defendant's Motion on January 22, 2018.

## II.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The factual allegations in the complaint need not be "detailed"; however, the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept a plaintiff's factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).  The court need not accept as true either "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S.

265, 286 (1986), or "inferences . . . unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). If the facts as alleged fail to establish that a plaintiff has stated a claim upon which relief can be granted, then a court must grant the defendant's Rule 12(b)(6) motion. *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

## III.   DISCUSSION

### A.   Fair Labor Standards Act Count

There is no allegation in this case that any Plaintiff was employed directly by Defendant. Rather, Plaintiffs' contention is that, under the Fair Labor Standards Act ("FLSA"), Defendant is a "joint employer" equally responsible for the payment of legally compliant wages. Defendant argues that Plaintiffs have not alleged facts that could support the plausible inference that it—along with the transportation providers—jointly employed Plaintiffs. *See* Def.'s Mot. at 9–16. It advances two primary arguments. First, Defendant asserts that, to the extent Defendant imposes requirements on the hiring of drivers, including background checks and qualification requirements, those are mere "quality control" or "minimum qualification" standards that do not legally rise to employer-level control. *Id*. at 11–14. Indeed, Defendant states that many of Plaintiffs' allegations concerning its involvement in their work "are not imposed by [Defendant] MTM, but are in fact required by the District of Columbia as reflected in the Contract [between Defendant and the District]." *Id*. at 11. Second, Defendant maintains that Plaintiffs critically fail to allege facts showing that Defendant has any control over setting Plaintiffs' work schedules and their rates of pay. *See id.* at 12–15. The absence of such facts, Defendant claims, is "inconsistent with the existence of an employer-employee relationship between the Plaintiffs and [Defendant]." *Id.* at 16. Plaintiffs counter that Defendant is taking an "unduly narrow interpretation" of the term "joint

employer," and that, under a correct reading, they have alleged facts that are sufficient to establish a joint employer relationship. *See* Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss, ECF No. 13 [hereinafter Pl.'s Opp'n], at 1, 7–22.

The FLSA conditions liability on the existence of an employer-employee relationship. *See* 29 U.S.C. § 206(a). The Act's definition of "employer" is expansive, as it "includes any person acting directly or indirectly in the interest of an employer in relation to an employee. *Id.* § 203(d); *Falk v. Brennan*, 414 U.S. 190, 195 (1973) (noting the "expansiveness of the FLSA's definition of 'employer'"). An entity "employs" an individual if it "suffer[s] or permit[s]" the individual to work." 29 U.S.C. § 203(g). To that end, an employee may be employed by more than one employer. The Act's regulations make this clear:

> A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer. A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case.

29 C.F.R. § 791.2(a). In such "joint employment" situations, all employers "are responsible, both individually and jointly, for compliance" with the FLSA. *See id*.

The D.C. Circuit has not specified a test for determining whether an alleged employer is a "joint employer" for purposes of the FLSA. It has, however, articulated pertinent principles in the related context of deciding whether a person claiming to be a "consultant" is in fact an "employee" for purposes of the FLSA. *See Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10–11 (D.C. Cir. 2001); *see also* Pls.' Opp'n at 7; *cf.* Def.'s Reply Br., ECF No. 16 [hereinafter Def.'s Reply], at 2. Interpreting the Supreme Court's decision in *Goldberg v. Whitaker House Co-op., Inc.*, the D.C. Circuit held in *Morrison* that whether an employer-employee relationship exists for

8

FLSA purposes turns on the "economic reality" of the employment arrangement rather than "technical concepts." 253 F.3d at 11 (citing *Goldberg*, 366 U.S. 28, 32–33 (1961)). "The 'test considers the extent to which typical employer prerogatives govern the relationship between the putative employer and employee.'" *Id.* (citing *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)). The D.C. Circuit identified four "typical employer prerogatives" for consideration: (1) the power to hire and fire employees; (2) the ability to supervise and control employees' work schedules or conditions of employment; (3) the authority to determine the rate and method of payment; and (4) the maintenance of employment records. *See id.* Additionally, the court cited a Second Circuit decision, *Brock v. Superior Care, Inc.*, that looked at "a different, although similar, set of [five] factors." *Id.* (citing *Brock*, 840 F.2d 1054, 1058–59 (2d Cir. 1988)). Ultimately, the court in *Morrison* noted that an employee's degree of "dependence" indicates her status, i.e., whether the factors establish that the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA. *See id.* (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976)).

The parties here place little emphasis on *Morrison*, presumably because it does not present the question of "joint employment," as opposed to mere "employment." Instead, they suggest that the court look outside the Circuit for guidance. Accepting that invitation takes the court through the looking glass into a dizzying world of multi-factor tests that attempt to distill the concept of "joint employment." *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 135 (4th Cir. 2017) (observing that courts have "had difficulty developing a coherent test distinguishing 'separate employment' from 'joint employment'"). A brief tour of the circuits illustrates the point.

The court starts with the circuit using the most factors, the Ninth Circuit. In *Bonnette v. Cal. Health & Welfare Agency*, the court began moderately and identified only four key factors.

*See Bonnette*, 704 F.2d 1465, 1407 (9th Cir. 1983); *see also Ivanov v. Sunset Pools Mgmt. Inc.*, 567 F. Supp. 2d 189, 194–95 (D.D.C. 2008) (relying on *Bonnette*).  The *Bonnette* test calls for an examination of "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Bonnette*, 704 F.2d at 1470; *see also In re Enter. Rent-a-Car Wage & Emp't Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012) (adopting *Bonnette*'s four-factor test, but emphasizing that those factors are not necessarily exhaustive).  Those are the same four factors identified by the D.C. Circuit in *Morrison*.  Not content with only four factors, however, the Ninth Circuit later upped the ante and added nine more factors, for a total of 13 for consideration.  *See Moreau v. Air France*, 356 F.3d 942, 947–48 (9th Cir. 2004); *Torres-Lopez v. May*, 111 F.3d 633, 639–40 (9th Cir. 1997). The court need not list all of them here.

The Eleventh Circuit keeps things simpler, relatively speaking.  It considers eight factors: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates and methods of payment; (4) the right, directly or indirectly, to hire, fire, or modify employment conditions; (5) preparation of payroll and payment of wages; (6) ownership of the facilities where the work occurs; (7) performance of a specialty job integral to the business; and (8) investment in equipment and facilities.  *See Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1176–78 (11th Cir. 2012).  The Eleventh Circuit adds to these eight factors five guiding principles, which emphasize that the core question of joint employment concerns the existence of "economic dependency."  *Id.*

The Second Circuit directs its trial courts to consider two fewer criteria than the Eleventh Circuit, for a total of six.  *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003).  Those

factors include:  (1) whether the putative joint employer's premises and equipment were used for the plaintiff's work; (2) whether the plaintiff's actual employer could shift workers from one putative joint employer to another; (3) the extent to which the plaintiff performs a "discrete line-job that [is] integral" to the putative joint employer's process of production; (4) whether responsibility under the relevant contracts could pass from one subcontractor to another without material change; (5) the degree of supervision exercised by the putative joint employer; and (6) whether the plaintiff worked exclusively or predominantly for the putative joint employer.  *See id.* at 72.  But these six factors are not exclusive; the Second Circuit has stated that a court also is "free to consider any other factors it deems relevant to its assessment of the economic realities." *Id.* at 71–72.

Most recently, the Fourth Circuit developed its own, six-factor, test.   In *Salinas v. Commercial Interiors, Inc.*, the court held that courts should consider: (1) "[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means"; (2) "[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment"; (3) "[t]he degree of permanency and duration of the relationship between the putative joint employers"; (4) "[w]hether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer"; (5) "[w]hether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another"; and (6) "[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibilities over functions

ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work."  848 F.3d 125, 141–42 (4th Cir. 2017).  In focusing on these criteria, the Fourth Circuit distinguished its approach from the four-factor approach in *Bonnette*, criticizing that approach for adhering to "common law agency" principles to determine joint employment status.  *See id.* at 142.  Its new test, the Fourth Circuit explained, was better suited to the task because its inquiry focuses on the relevant relationship between the putative joint employers, as set forth in the Department of Labor's FLSA "joint employment" regulation.  *See id.* at 142 (citing 29 C.F.R. § 791.2[2]).

Other circuits employ fewer factors.  *See, e.g., Johnson v. Unified Gov't of Wyandotte Cty./Kansas City, Kansas*, 371 F.3d 723, 729 (10th Cir. 2004) (focusing on "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; and (5) the degree of skill required to perform the work").  And, the Seventh Circuit has simply said that "[t]he joint-employment analysis turns—as does any assessment of a putative employment relationship—on the totality of the circumstances, with a particular focus on the control exercised by the alleged employer over a person's working conditions."  *Bridge v. New*

---

[2] 29 C.F.R. § 791.2(b) provides:

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Holland Logansport, Inc.*, 815 F.3d 356, 363 (7th Cir. 2016); *see also Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (acknowledging the four *Bonnette* factors are relevant but declining to adopt them as the "*only* relevant factors, or even the most important").

In this case, the parties espouse different tests.  Plaintiffs urge the court to use the factors articulated in the Fourth Circuit's decision in *Salinas*, Pls.' Opp'n at 7–22, whereas Defendant relies on the four *Bonnette* factors, Def.'s Mot. at 10.  Plaintiffs also assert that, even if the court were to apply the *Bonnette* factors, their FLSA claim survives the motion to dismiss.  Pls.' Opp'n at 4, 19–22.

At this early stage of the litigation, the court declines to choose a test or conduct a factor-by-factor analysis.  That is because "the ultimate determination" of whether an entity is a joint employer "must be based 'upon the circumstances of the whole activity.'"  *Johnson v. Serenity Transp., Inc.*, 141 F. Supp. 3d 974, 990 (N.D. Cal. 2015) (quoting *Rutherford Food Corp.*, 331 U.S. at 730).  Put another way, the question of joint employer status is "essentially a fact issue." *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) (stating that the question of joint employment before the National Labor Relations Board, for purpose of defining the bargaining unit, is "essentially a fact issue").  Therefore, defeating a claim of joint employment at the motion to dismiss stage is no easy task.  *See Kaiser v. Trofholz Tech., Inc.*, 935 F. Supp. 2d 1286, 1293 (M.D. Ala. 2013) (holding that the determination of joint employment is best addressed "after the parties have had an opportunity to uncover facts through discovery to support or refute this claim").  The very cases cited in the parties' briefings make the point, as most are decisions made at the summary judgment stage.  *See* Def.'s Mot. at 2–13; Pl.'s Opp'n at 5–22; Def.'s Reply at 2–13.  In the rare instances where courts have dismissed an FLSA claim premised on joint employment on a Rule

12(b)(6) motion to dismiss, they do so when the plaintiff failed to allege *any* facts that would support the inference that the defendant had any control over the employment relationship.  *See, e.g.*, *Al-Quraan v. 4115 8th St. NW, LLC*, 113 F. Supp. 3d 367, 370 (D.D.C. 2015) (rejecting assertion of employer or joint employer status where there were "no allegations that [the defendant] had any involvement in managing employee work schedules or conditions of employment, maintained any employment records, or had the power to hire and fire Plaintiff or any other employees"); *Attanasio v. Comm. Health Sys., Inc.*, 863 F. Supp. 2d 417, 425–26 (M.D. Pa. 2012) (dismissing FLSA claim because the plaintiffs had not provided facts that would raise the plaintiff's claim of defendant's status as a joint employer "above a speculative level" because pleadings lacked "operative details" regarding the defendant's alleged authority over and supervision of the plaintiffs).

But here, Plaintiffs' claim of joint employment is neither conclusory nor lacking in "operative details."  Plaintiffs allege an array of facts concerning Defendant's involvement in their work, all of which the court accepts as true at this stage of the litigation.  *See Hettinga*, 677 F.3d at 476.  Specifically, they charge that Defendant directed and controlled how they conducted their work by imposing "transportation standards," "client protocols and procedures," "dispute resolution procedures," "accident/investigation procedures," and other regulations contained in Defendant's "Transportation Provider Handbook."  Compl. ¶ 28.  And there is more.  Defendant required drivers' vehicles to be inspected daily, and it reserved the right to take out of service any vehicles that did not meet its standards.  *Id*. ¶¶ 36, 82.  As for work schedules, Plaintiffs allege Defendant indirectly controlled them by dictating which trips were assigned to which transportation providers within its network and by requiring those providers to complete all trips assigned to it.  *See id*. ¶ 31.  Finally, the Complaint contains multiple allegations that Defendant possesses both hiring and firing power,

including the right to prohibit providers from using drivers who have not been "fully credentialed and approved" by Defendant, to mandate drivers "complete and pass" Defendant's training, to require drivers possess certain minimum qualifications, and to disapprove of the hiring of, or suspend, any driver for good cause at Defendant's discretion. *Id.* ¶¶ 34(a)–(d). These allegations, individually and collectively, belie Defendant's position that Plaintiffs' "allegations as to [Defendant's] control over their work . . . relate entirely to matters of quality control" and minimum qualifications. *See* Def.'s Mot. at 11, 13; *cf. Salinas*, 848 F.3d at 148 (stating that "an entity does not become a joint employer by engaging in the oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness"). Rather, Plaintiffs have alleged Defendant exercised sufficient control over their work at all stages of their employment, from hiring, to performance, to termination, to qualify as a joint employer.

The Contract, which Defendant introduced with its Motion to Dismiss, only bolsters Plaintiffs' allegations of control. For example, the Contract requires Defendant to ensure that drivers: wear "company-authorized uniforms . . . worn in an approved manner," Contract ¶ C.5.2.3.3.4(f); wear and present a visible company I.D. badge, *id.* ¶ C.5.2.3.3.5(e), (j); refrain from smoking, eating or consuming beverages while driving, *id.* ¶ C.5.2.3.3.5(f); and act in a "courteous, patient, and helpful" manner to all passengers, *id.* ¶ C.5.2.3.3.4(a). Additionally, under the Contract, Defendant must ensure conformance to vehicle appearance standards. So, for example, a driver's photograph must appear "on the interior sidewall" of the vehicle, in view of the passenger; certain signage must be displayed on the interior and exterior; and the interior must meet cleanliness requirements. *Id.* ¶¶ C.5.2.3.2.5(z)–(dd); C.5.2.3.3.5(s). Moreover, Defendant requires all customer complaints and passenger violations of rules be reported to Defendant.

Compl. ¶ 35(b), (c). The Contract, in short, sets forth a host of conditions of employment that, at the motion to dismiss stage, gives rise to the plausible inference that Defendant is a joint employer.

Defendant takes a different view of the Contract's legal significance. It contends that, under the Contract, it is no more than a transportation "broker" and, in that capacity, merely implements and enforces standards set by the District of Columbia in that Contract. Therefore, Defendant argues, it cannot be held liable as a joint employer. *See* Def.'s Mot. at 11. The court rejects this contention for two reasons. First, the court cannot conclude, as a factual matter, based on no more than the Complaint and the Contract, that Defendant controls Plaintiffs only insofar as required by the Contract. Discovery may show evidence of control beyond the requirements of the Contract. Second, Defendant's implementation and enforcement of the District's contractually-imposed standards does not necessarily absolve it of liability under the FLSA. Congress intentionally drew the definition of "employer" under the FLSA to have a broad sweep. *See United States v. Rosenwasser*, 323 U.S. 360, 362–63 (1945). In fact, "[t]his definition derived from state child-labor laws, which imposed liability not only on businesses that directly employed children but also on 'businesses that used middlemen to illegally hire and supervise children.'" *Salinas*, 848 F.3d at 133 (quoting *Antenor v. D & S Farms, Inc.*, 88 F.3d 925, 929 n.5 (11th Cir. 1996)). The court does not reference this bit of legislative history to suggest that Defendant is the equivalent of such middlemen; they surely do not compare. Rather, the court does so to emphasize that Defendant's claimed position as a mere "broker" of transportation services does not necessarily establish that it falls outside the "remedial and humanitarian" purposes of the FLSA, which the Supreme Court has instructed "must not be interpreted or applied in a narrow, grudging manner." *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944). Therefore, without controlling

precedent that categorically excludes businesses in Defendant's position from joint employer liability, summary judgment is the proper stage at which to resolve Defendant's status.

Defendant's attempt to liken this case to a case from this District Court, *Ivanov v. Sunset Pools Management*, also is unavailing. *See* Def.'s Reply at 3–4; Hr'g Tr., 1/22/2018, at 5–6, 10. The plaintiffs in *Ivanov* were foreign citizens who were recruited by an international staffing firm to work in the United States for a company that provided lifeguarding services to entities that operate pools. 567 F. Supp. 2d. at 190–91. They sought to hold the staffing firm liable for wage violations under the FLSA under a joint employer theory. *See id.* at 194–95. The staffing firm had required the plaintiffs to attend its orientation session and report to it changes in employment and address. *Id.* at 194–95. It also kept copies of the plaintiffs' employment records and assisted them with their visa, immigration, and health insurance paperwork. *Id.* at 195. But the court concluded that the firm's participation in the plaintiffs' employment was inadequate to establish an employer-employee relationship because the firm's participation was "unrelated to [the plaintiffs'] jobs as lifeguards" and because the firm merely was complying with "State Department regulations." *Id.* Here, Defendant focuses on the latter rationale, but ignores the former. Unlike in *Ivanov*, Defendant's involvement in Plaintiffs' employment is alleged to be *directly* related to their work as drivers. That factor—in addition to the fact that *Ivanov* was resolved on summary judgment—distinguishes this case from *Ivanov*.

Finally, Defendant insists that the absence of an allegation that Defendant actually set drivers' wages is fatal to Plaintiffs' claim. Not so. The joint employer tests employed by courts are factor tests, not elements tests, where no factor is outcome-determinative. *See Morrison*, 253 F.3d at 11; *Zheng*, 335 F.3d at 69; *Salinas*, 848 F.3d at 141–42; *Bonnette*, 704 F.2d at 1469–70.

Therefore, the fact that Plaintiffs do not allege that Defendant actually dictated how much they earned does not preclude a finding that Defendant was their joint employer.

Accordingly, for the reasons explained, Plaintiffs may proceed to discovery on their FLSA claim.

### B.   D.C. Minimum Wage Revision Act Count

In Count Two, Plaintiffs allege that Defendant violated the D.C. Minimum Wage Revision Act by failing to pay them a sufficient hourly wage and a premium overtime wage. Compl. ¶¶ 133–42. The D.C. Minimum Wage Revision Act sets the minimum wage "to be paid by any employer in the District of Columbia," at either the greater of the applicable rate set in the statute or the minimum wage set under the FLSA, plus $1, whichever is greater. D.C. Code § 32-1003(a). As with the FLSA, the Act requires employers to pay employees 1.5 times the employee's normal hourly wage for work performed in excess of 40 hours in the week. *Id.* § 32-1003(c). Plaintiffs argue alternative theories of liability: Defendant is liable for the wage violations either because Defendant is Plaintiffs' employer for purposes of the statute or because Plaintiffs are employees of Defendant's *subcontractors*, i.e., the transportation providers.

As to Defendant's former theory, the parties agree that, if Plaintiffs have stated a claim for joint employer liability under the FLSA, they also have successfully pleaded a claim under the D.C. Minimum Wage Revision Act. *See* Def.'s Mot. at 16–17; Pl.'s Opp'n at 5–7; *see also* D.C. Code § 32-1002(1) (defining "employ" as "includ[ing] to suffer or permit to work," like the FLSA); *Wilson v. Hunam Inn., Inc.*, 126 F. Supp. 3d 1, 5–6 (D.D.C. 2015) (stating that courts construe the FLSA and the D.C. Minimum Wage Act "conterminously for purposes of determining who is liable as an employer"). Thus, having stated a viable claim under the FLSA, Plaintiffs likewise have stated a cognizable claim under the D.C. Minimum Wage Revision Act.

Plaintiffs also have stated a claim under their alternative theory of liability, namely, that Defendant is liable as a general contractor for the providers' wage violations. The D.C. Minimum Wage Revision Act provides that "[a] subcontractor, including any intermediate subcontractor, and the general contractor shall be jointly and severally liable to the subcontractor's employees" for violations of the Act. D.C. Code § 32-1012(c). The statute does not define the terms "general contractor" or "subcontractor." Thus, the court construes those terms "in accordance with [their] ordinary or natural meaning[s]." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The ordinary meaning of the term "general contractor" is "[s]omeone who contracts for the completion of an entire project, including purchasing all materials, hiring and paying subcontractors, and coordinating all the work." Black's Law Dictionary (10th ed. 2014). A "subcontractor" is "[s]omeone who is awarded a portion of an existing contract by a contractor, esp. a general contractor." *Id.* A subcontractor, therefore, agrees to do a portion of the work that the general contractor promises to deliver to a client.

Here, at the motion to dismiss stage, Defendant and the transportation companies comfortably fit within the definitions of general contractor and subcontractor, respectively. The terms of the Contract support this conclusion. Under the heading "General Contractor Responsibilities," the Contract provides that Defendant shall, among other things: (1) "provide NET [non-emergency transportation services] services to Eligible Recipients in the District"; (2) "ensure that Transportation Services are provided in compliance with the requirements set forth herein"; (3) "utilize the . . . pool of active NET Transportation Providers currently enrolled in the District's Medicaid NET program to select from and develop a provider Network;" and (4) "provide the oversight and monitoring of the day-to-day operations necessary for the delivery of NET." Contract ¶¶ C.5.1.1, C.5.1.2, C.5.1.4. The Contract further requires Defendant to pay

network transportation providers with the funds it receives from the District of Columbia under the Contract. *Id.* ¶ C.5.1.11(f). Reading these terms in the light most favorable to Plaintiffs, Defendant agreed with the District of Columbia, not merely to broker non-emergency transportation services to qualifying Medicaid recipients, but also to "provide" such services. And, in order to carry out that overarching contractual obligation, Defendant must contract with companies that own and operate vehicles and employ drivers to transport Medicaid patients. *See id.* ¶ C.5.2.a (describing "Transportation Providers" as consisting of, among others, "ambulatory vans, wheelchair vans, and stretcher van vehicles" and "Drivers and Attendants"). Indeed, because the Contract expressly prohibits Defendant from directly supplying transportation services, *see id.* ¶ C.5.1.5, companies like those that employ Plaintiffs are essential to Defendant fulfilling its contractual duty to "provide" transportation services and, thus, plausibly qualify as subcontractors under the D.C. Minimum Wage Revision Act.

To avoid this conclusion, Defendant asserts that it is not a general contractor relative to the transportation providers because those companies "perform a function"— the actual transporting of Medicaid recipients—that is "different than that for which [Defendant] was contracted by the District, and one which [Defendant] is contractually prohibited from performing." Def.'s Mot. at 17–18. That argument, however, misses the mark. The fact that Defendant performs a "different" function than the transportation companies does not disqualify it from being a general contractor. Indeed, the opposite is often true. In the construction industry, for example, the primary obligation of a general contractor for a large scale project is to develop a budget for the project and coordinate the construction schedule, not to do the construction itself. The tasks involved in actually erecting the building are performed by subcontractors, such as electricians, plumbers, and the like.[3] Thus,

---

[3] *See* "Subcontractor," *https://legal-dictionary.thefreedictionary.com/Subcontractor*.

subcontractors routinely do "different" work than general contractors.   Second, Defendant construes its duties under the Contract too narrowly.   Its responsibility, broadly speaking, and per the language of the Contract, is to "provide" non-emergency transportation services, not just broker them.   Contract ¶ C.5.1.2.   Thus, while Defendant may not directly transport Medicaid recipients, the scope of its work can plausibly be read to encompass the purposes for which Plaintiffs' companies are hired.

Defendant also relies on the Contract's text to avoid the designation of "general contractor."   Def.'s Mot., at 18.   Specifically, it points to a clause that states:   "[T]he Broker shall not subcontract any portion of the Broker's requirements contained in this contract."   Contract ¶ C.5.1.5.   That clause, Defendant contends, "confirm[s]" the lack of a subcontractor-contractor relationship between Defendant and the transportation providers.   Def.'s Mot. at 18.   The D.C. Minimum Wage Revision Act, however, expressly rejects the notion that a contractual term can alter a party's legal status under the statute.   The Act states that, unless authorized by law, "no provision of this chapter shall in any way be contravened or set aside by private agreement." D.C. Code § 32-1305(a).   Thus, a company's obligations are fixed by the statute itself and cannot be altered through the employer-employee contract.   Accordingly, Defendant cannot find refuge in a provision barring subcontracting to avoid general contractor liability.

In sum, then, Plaintiffs have alleged facts that give rise to a plausible inference that Defendant is a general contractor under the Minimum Wage Act and therefore may be held liable for Plaintiffs' employers' alleged wage law violations.

## C.     D.C. Living Wage Act Count

The D.C. Living Wage Act requires recipients of government contracts of $100,000 or more to pay their "affiliated employees" the living wage, which is an hourly rate set by the District

of Columbia.  D.C. Code § 2-220.03(a).  (Likewise, "[a]ll subcontractors of recipients of these contracts" who receive at least $15,000 in District of Columbia funds must pay their affiliated employees that rate.  *Id*.)  An "affiliated employee" is defined broadly in the Act as "any individual employed by a [contract] recipient who received compensation directly from government assistance or a contract with the District of Columbia . . . including any employee of a contractor or subcontractor of a recipient who performs services pursuant to government assistance or contract."  *Id*. § 2-220.02(1).  Here, Plaintiffs contend, they qualify as Defendant's "affiliated employees" under the Living Wage Act—because they are "employee[s] of a . . . subcontractor of a recipient"—such that Defendant is responsible for paying them the District of Columbia's living wage.  Compl. ¶¶ 144–46.

Defendant here does not dispute Plaintiffs' assertion that Plaintiffs are "affiliated employees," as defined under the Living Wage Act.  *See* Def.'s Mot. at 19–20; Def.'s Reply at 15–16–17.[4]  Instead, Defendant seeks dismissal of Plaintiffs' Living Wage Act claim on the ground that the work performed by the drivers—transporting Medicaid patients—is exempted under the Act's "Medicaid provider" exemption, which states as follows:

> The following types of contracts, government assistance, and employment shall be exempt from the requirement of this subchapter: . . .
>
> (9) Medicaid provider agreements for *direct care services* to Medicaid recipients; provided, that the direct care service is not provided through a home care agency, a community residence facility, or a group home for persons with intellectual disabilities, as those terms are defined in [D.C. Code] § 44-501.

---

[4] The court already has found that Plaintiffs have plausibly alleged that they are "subcontractors," therefore even if Defendant did dispute that Plaintiffs qualify as "affiliated employees," the court would reject that argument for the reasons previously stated.

D.C. Code § 2-220.05(9) (emphasis added).  Thus, unless excepted from the requirement, Medicaid providers of "direct care services" are not subject to the Living Wage Act.  Because Plaintiffs drive Medicaid patients to medically necessary doctors' appointments, Defendant asserts that they are covered by the "direct care services" exemption.  Def.'s Mot. at 19–20; Def.'s Reply at 16.  Plaintiffs think otherwise.  They contend that "direct care services" is a term of art in the healthcare field and that transportation services do not fall under that definition.  Pls.' Opp'n at 25–26.  Thus, while both parties agree that "direct care services" refers to the rendering of some type of assistance to Medicaid recipients, the parties dispute what kind of assistance is covered.

In questions of statutory interpretation, courts begin with the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).  If the term has a "plain and unambiguous meaning," the court's inquiry ends.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  Whether statutory language is "plain" depends on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Id.*  Here, the statute itself leaves no breadcrumbs by which the court might trace the D.C. Council's path.  The Living Wage Act does not define the term "direct care services;" nor does D.C. Code § 44-501, which is the provision cross-referenced in the exemption.  Other sources likewise are unhelpful.  The District of Columbia regulations concerning the exemptions provide no guidance.  *See* D.C. Mun. Regs. tit. 7, § 1007(i).  And the statute's legislative history is silent on the meaning of "direct care services."  *See* D.C. Council, Comm. on Gov't. Operations, Report on Bill 16-286 (D.C. 2005).

In the absence of a statutory definition, the parties here rely on two competing canons of statutory construction.  Defendant's argument rests on the canon that, absent an express definition, courts normally interpret undefined words "as taking their ordinary, contemporary, common meaning."  *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (quoting *Perrin v. United States*,

444 U.S. 37, 42 (1979)).  To that end, Defendant hones in on the word "care."  It argues that, because transportation companies provide Medicaid patients with a mode of "access[ing] . . . medical care," they are rendering "care" under the Contract.  Def.'s Mot. at 19–20 (quoting the Contract).  "Care" is defined in dictionaries as including: (1) "charge, supervision," Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/care; (2) "[a]ttentive assistance or treatment to those in need," American Heritage Dictionary, www.ahdictionary.com/word/search.html?q=care; and (3) "[c]harge; oversight with a view to protection, preservation, or guidance," Oxford English Dictionary (2d ed. 1989), http://www.oed.com/view/Entry/27899.  The provision of non-emergency medical transportation services, as Defendant contends, comports with these definitions of "care."

Plaintiffs, on the other hand, ask the court to look to a different canon of construction, namely, when statutes use "technical words or terms of art," "it (is) proper to explain them by reference to the art or science" that they concern.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974); *accord La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 372 (1986).  Plaintiffs place emphasis on the full phrase "direct care services," which, they contend, has a distinct meaning within the healthcare field.  *See* Pls.' Opp'n at 25–26 (citing sources).  For support, Plaintiffs cite a 2008 publication from the Institute on Medicine that defines "direct care" workers to mean "nurse aides, home health aides, and personal- and home-care aides."  Institute on Medicine Committee on the Future Health Care Workforce for Older Americans, Retooling for an Aging America: Building the Health Care Workforce 199 (2008), available at https://www.ncbi.nlm.nih.gov/books/NBK215393/. Plaintiffs also point to federal law, Pl.'s Opp'n at 25 (citing the Public Health Service Act, 42 U.S.C. § 201 *et seq.*), which defines "direct care worker" as the "meaning given that term in the 2010 Standard Occupational Classifications of the Department of Labor for Home Health Aides [31-1011], Psychiatric Aides [31-1013], Nursing Assistants [31-1014], and Personal Care Aides [39-

9021]," 42 U.S.C. § 295p(16).  Those terms' meanings focus on the general provision of medical and daily living supports.  *See* Bureau of Labor Statistics, Standard Occupational Classification 2010, *available at* https://www.bls.gov/soc/2010/home.htm.  None of those positions primarily involve transporting a person to and from medical appointments.

The court thinks Plaintiffs have the better of the argument.  "Ultimately, context determines meaning."  *Johnson v. United States*, 559 U.S. 133, 139 (2010).  And so, the court looks to the term's use in the overall statutory scheme.  The pertinent statutory text exempts "Medicaid provider agreements for direct care services to Medicaid recipients . . . [unless] provided through a home care agency, a community residence facility, or a group home for persons with intellectual disabilities."  D.C. Code § 2-220.05(9).  In other words, all providers of Medicaid-covered "direct care services" are exempt from the Living Wage Act, except when delivered through one of the three enumerated modes.  To define those modes, the Medicare provider exemption expressly cross-references and adopts the definitions of those terms as set forth in the Health-Care and Community Residence Facility, Hospice, and Home Care Licensure Act, D.C. Code § 44-501.  As defined in that Act, "Home care agency" means an entity, other than a hospice, that "directly provides skilled nursing services and at least one other therapeutic service to an individual."  D.C. Code § 44-501(7).  Similarly, the definitions of "community residence facility" and "group home for persons with intellectual disabilities" refer to "a sheltered living environment for individuals who desire or need such an environment because of their physical, mental, familial, social, or other circumstances."  *Id.* § 44-501(4); *id.* § 44-501(5) (incorporating the term "community residence facility").  Thus, all three defined terms focus on the provision of medical care or daily living assistance in a residential setting.  So, when the term "direct care services" is read alongside the definitions of the excepted modes of such service, the definitional intent of the City Council becomes more apparent:  "direct care

services" must be understood as relating to medical or therapeutic services or services that support daily living in a residential setting.  Read in that manner, the term does not include a business whose sole purpose is to transport Medicaid recipients to and from medical appointments.

Other relevant sources support this reading.  The District of Columbia's Health and Mental Health regulations routinely uses the term "direct care" in the context of rendering of health services by medical professionals.  *See, e.g.,* D.C. Mun. Regs. tit. 22-B, § 3911.2(h) (requiring clinical records for patients in home care agencies to contain "[c]linical, progress, and summary notes, and activity records, signed as dated as appropriate by professional and direct care staff"); *id.* § 3510.6 (mandating when employees at group homes for persons with intellectual disabilities for whom "direct care certification is available" must pass evaluations); *id.* § 3511 (setting "minimum daily ratio of on-duty, direct cares staff to residents" in group homes for persons with intellectual disabilities); D.C. Mun. Regs. tit. 22-A, § 599 (defining "staff" in a Department of Mental Health regulation as "individuals with responsibility for managing a person's health care or participating in an emergency, and who are employed by the [mental health] provider . . . including . . . physicians, nurses, orderlies, resident physicians, interns, and direct care workers").  None of the above uses of "direct care" can reasonably be read to encompass transportation services.

Federal FLSA regulations point in the same direction.  In 2013, the Department of Labor revised its rules to bring more workers under the FLSA's protections.  *See Application of the Fair Labor Standards Act to Domestic Service*, 78 Fed. Reg. 60,454, 60,455–56 (Oct. 1, 2013).[5]  In adopting those amendments, the Department of Labor traced the history of its "companionship

---

[5] The court acknowledges that the regulatory action discussed in this paragraph post-dates the District of Columbia's adoption of the Medicaid direct care services exemption.  *See Way to Work Amendment Act of 2006*, D.C. Law 16-118 (Act 16-335) (2006).  Despite this, the court looks to the FLSA rulemaking for guidance for two reasons: (1) the Department of Labor discusses historical trends in the healthcare industry, and thus provides context for the factual landscape at the time the D.C. City Council adopted the exemption; and (2) the Medicaid provider exemption in D.C. Code § 2-220.05(9) concerns itself with the location of the rendering of services, which the Department of Labor also discusses when explaining the evolution of rendering medical care.

services" exemption, which was adopted in 1974. *Id.* at 60,457–59.  Although the Department had

intended that exemption to cover only unskilled workers who accompanied individuals, courts

interpreting the exemption did so more broadly and found that it covered a "wide range of direct

care workers," such as home health aides and personal care aides who provided services to

individuals at their homes. *Id.*  In other words, home health aides and personal care aides did not

enjoy the FLSA's protections.  That changed in 2013.  In light of courts' broad interpretation of

"companionship services" and the "dramatic transformation" in the health care industry, which

resulted in more medical services being rendered in patients' homes, the Department decided to

narrow the scope of the "companionship services" exemption to remove "direct care workers"

from its purview.  *Id.* at 60,454–55, 60,458, 60,469.  Thus, with the change, "direct care workers"

are now covered by the Act's protections.  When announcing the amendment, the Department

described "direct care workers," as employees who provide home care services, including

"certified nursing associates, home health aides, personal care aides, and caregivers."  *Id.* at

60,455.  Moreover, the Department noted, these workers "perform increasingly skilled duties" and

are "professional caregivers."  *Id.*; *see also id.* at 60,472.  In short, the Department's interpretation

of "direct care worker" does not include providers of full-time transportation services.[6]

In the end, when the Medicaid provider exemption is read in context and against the

pertinent regulatory background, the court concludes that the most logical reading of "direct care

services" is that it refers to medical or daily-living-assistance services.  Plaintiffs, as non-health-

care workers who transport Medicaid patients to and from appointments, therefore, do not deliver

---

[6] Defendant's contention that its drivers assist passengers with seating and with safely entering and exiting vehicles
does not change the court's view.  *See* Def.'s Reply at 16.  Likewise, the fact that Defendant shows up in a search of
the District of Columbia's "Medicaid provider" contracts does not move the dial in Defendant's favor.  *See* Def.'s
Mot. at 20; Def.'s Mot., Ex. 3, ECF No. 10-3.

"direct care services."   Accordingly, neither Defendant (nor Plaintiffs' employers) are exempt from the directives of the Living Wage Act.

### D.      District of Columbia Wage Payment and Collection Law Count

Plaintiffs' fourth count, which falls under the District of Columbia Wage Payment and Collection Law, D.C. Code § 32-1301 *et seq*., rests on Plaintiffs' other claims concerning the underpayment of wages: the Minimum Wage Revision Act and the Living Wage Act counts.  *See* Compl. ¶¶ 156–62; *see also* D.C. Code §§ 32-1301, 32-1308.   Because the court holds that Plaintiffs have stated claims under both of these District of Columbia laws, Plaintiffs may proceed with their claim under the Wage Payment and Collection Law.

### E.      Breach of Contract Count

At last, the court arrives at Plaintiffs' breach-of-contract cause of action.  This claim rests on the theory that Plaintiffs are third-party beneficiaries of Defendant's Contract with the District of Columbia, because the Contract requires Defendant: (1) "to pay its employees and subcontractors who perform subservices under the contract" the established living wage; and (2) to include in any subcontracts a clause requiring the subcontractor pay its employees the living wage.  *See* Contract ¶¶ H.8.2, H.8.3.  Plaintiffs allege that Defendant has breached this obligation to pay drivers the living wage.  Compl. ¶¶ 165–69.  Defendant counters that Plaintiffs are not third-party beneficiaries of the Contract and, therefore, Plaintiffs cannot pursue a breach-of-contract claim for the alleged violations.  Def.'s Mot. at 21–22.

The court agrees with Defendant.  Under District of Columbia law, a third-party to a contract may sue to "enforce the contract's provisions if the contracting parties intend[ed] the third party to benefit directly thereunder."  *Monument Realty LLC v. Wash. Metro Trans. Auth.*, 535 F. Supp. 2d 60, 70 (D.D.C. 2008).  However, a "party that *incidentally* benefits from contractual

provisions to which it is not a party is not a third-party beneficiary." *Corp. Sys. Res. v. Wash. Metro. Area Trans. Auth.*, 31 F. Supp. 3d 124, 132 (D.D.C. 2014) (emphasis added).  That principle holds true particularly for government contracts.  District of Columbia law recognizes "the basic contract principle that third party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary." *Moore v. Gaither*, 767 A.2d 278, 287 (D.C. 2001) (internal citation omitted).  Thus, a third-party that claims to be a beneficiary of a government contract faces an uphill climb.

Plaintiffs here have failed to show the contracting parties clearly intended for them to be beneficiaries of the Contract.  The provisions on which Plaintiffs rely are not the result of the parties' arms-length negotiations, but rather are contained in the Contract because the Living Wage Act itself requires their inclusion.  *See* D.C. Code § 2-220.04(a) (providing "[a]ll contracts and government assistance . . . shall include the requirements").  Indeed, the Contract incorporates the Act's provisions, including its exemptions, in full.  *Compare id.* § 2-221.01 *et seq.*, *with* Contract ¶¶ H.8 to H.8.9.  Thus, the Contract's Living Wage Act requirements are not reflective of the parties' intent, but rather the City Council's.  Plaintiffs therefore are not third-party beneficiaries who can enforce the Contract.  Accordingly, Plaintiffs' breach-of-contract claim is dismissed.

## IV.   CONCLUSION AND ORDER

For the reasons stated above, Defendant's Motion to Dismiss is granted in part and denied in part.  Defendant's motion to dismiss is granted as to Plaintiffs' breach-of-contract claim, but is denied with respect to the remaining four counts.

Dated: March 5, 2018

Amit P. Mehta
United States District Judge