# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ISAAC HARRIS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Case No. 17-cv-01371 (APM)** |
| ) | |
| MEDICAL TRANSPORTATION ) | |
| MANAGEMENT, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs in this putative class action are drivers who claim that they have been underpaid in violation of federal and local wage laws for transporting Medicaid patients in the District of Columbia. Defendant Medical Transportation Management, Inc. ("MTM") is a private company that contracts with the District of Columbia to "manage and administer" non-emergency transportation services for Medicaid recipients. While MTM does not employ drivers directly, it contracts with various transportation service providers who directly employ drivers—Plaintiffs in this case—to fulfill its contracts with the District. Following class discovery, Plaintiffs move to certify the class and appoint Plaintiffs' counsel as class counsel. MTM opposes certification and, as part of that effort, seeks to exclude Plaintiffs' expert. Plaintiffs also move to strike one of MTM's declarants.

For the reasons that follow, the court denies the motion for class certification. Although Plaintiffs' request for class certification passes muster under Federal Rule of Civil Procedure Rule 23(a), Plaintiffs fail to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members," as required under Rule

23(b)(3).  Additionally, Plaintiffs' request for certification of an issue class under Rule 23(c)(4) is denied without prejudice, because that request is not sufficiently briefed.  Finally, the court denies as moot the parties' respective motions to strike.

## I.    BACKGROUND

### A.    Factual Background

Defendant MTM contracts with the District of Columbia to provide non-emergency medical transportation ("NEMT") to and from medical appointments for District of Columbia residents eligible for Medicaid.  Compl., ECF No. 1 [hereinafter Compl.], ¶ 15; Pls.' Mot. for Leave to File Excess Pages, ECF No. 130, Ex. 1, ECF No. 130-3 [hereinafter PEX 1].[1]  The District first contracted with Defendant around 2007, and during the last decade, the parties have entered into new agreements or extensions multiple times.  *See* Compl. ¶¶ 22–24.  The most recent contract—a three-year, $85 million contract—took effect in December 2015.  *See id.* at ¶ 24.

MTM does not employ drivers directly but instead functions like a "transportation broker" or a "[g]atekeeper of transportation service requests."  *Harris v. Med. Transp. Mgmt., Inc.*, 300 F. Supp. 3d 234, 237 (D.D.C. 2018) (citations omitted).  MTM operates a call center to receive and process Medicaid recipients' transportation requests, validates the requesters' eligibility, and assesses the medical necessity of the requested transportation.  *Id.*  MTM then assigns the request to a transportation service provider.  *Id.*; *see also* Compl. ¶ 18.  MTM subcontracts with over 80 transportation service providers, or TSPs, and these companies employ drivers to perform the transportation services required by MTM's contracts.  *See* Compl. ¶¶ 18–19; *see also* PEX 5.

Plaintiffs Isaac Harris, Darnell Frye, and Leo Franklin are current or former drivers for transportation service companies that provide NEMT services to Medicaid patients in the District

---

[1] Plaintiffs' exhibits to their class certification motion and reply motion, noted as "PEX," are found at ECF Nos. 130, 131, 155, and 156.

of Columbia.  Compl. ¶¶ 1, 21–22.  The TSPs who employ Plaintiffs have agreements with MTM
to provide transportation services.  *Id.* ¶ 19.  Plaintiffs claim that, although each individual TSP
sets its drivers' wages and work schedules, MTM dictates other aspects of the drivers' work
through the service agreements between MTM and the TSP.  *Id.* ¶ 27.  For example, MTM controls
the process of approving the hiring of new drivers by requiring that the driver be "fully credentialed
and approved by MTM."  *Id.* ¶¶ 34a, 50, 68, 79; *see also* PEX 5 at MTM 000920.  MTM trains the
TSPs on what is needed for drivers to be approved to work, maintains an online portal for TSPs to
upload documents proving that the drivers meet MTM's requirements, and stores the drivers'
information in an MTM database.  Compl. ¶ 37; PEX 53.  And MTM can cancel its contract with
a TSP if it uses an unapproved driver on MTM trips.  PEX 54; PEX 51 at MTM 000807.

Further, MTM oversees the drivers' training.  Compl. ¶¶ 51, 69, 80.  MTM employees hold
trainings that must be completed by each potential new driver.  PEX 55, at 1; PEX 7 at 186:10-
187:11.  These include a defensive driving training; CPR and first aid training; a fraud, waste, and
abuse training; and an MTM driver certification training.  PEX 7 at 83:6-20, 84:10-13; 85:8-12;
85:14-22, 86:19–88:13.  The MTM driver certification training alone contains nine individual
training components.  *Id.* at 88:2-8, 168:22–171:5; 186:10–187:11; PEX 56; PEX 57; PEX 58.
And, MTM requires that drivers submit to periodic retraining.  PEX 7 at 171:12-13.

MTM's standard agreement with TSPs also lists rules that apply to drivers and govern their
work performance.  PEX 5 at MTM 000917-918, 934.  These include rules regarding the drivers'
appearance, including requiring them to wear authorized uniforms, Ex. 5 at MTM 000917, 934; *see
also* PEX 7 at 108:10–109:4, as well as rules regarding MTM's customer service standards, PEX
56 at MTM 000531–35.

### B.      Procedural History

On July 13, 2017, Plaintiffs filed a putative class and collective action against MTM, asserting five causes of action.  *See generally* Compl.  In Count One, they allege that MTM violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., by failing to pay Plaintiffs the minimum wage and overtime rates required by federal law.  Compl. ¶¶ 124–32.  Counts Two, Three, and Four allege that MTM violated, respectively, (1) the D.C. Minimum Wage Act, D.C. Code § 32–1001 *et seq*.; (2) the D.C. Living Wage Act, D.C. § 2–220.01 *et seq*.; and (3) the D.C. Wage Payment and Collection Law, D.C. Code § 32–1301 *et seq*.  Compl. ¶¶ 133–62. Finally, Count Five alleges that Defendant breached its contract with the District of Columbia by violating the Living Wage Act.  *Id*. ¶¶ 163–69.

Plaintiffs' theory of liability turns on MTM's relationship to individual drivers.  Although MTM is not their "employer" in the traditional sense—drivers are not on MTM's payroll, for example—Plaintiffs assert that MTM is nevertheless liable for their underpaid wages because it is a "joint employer" or "general contractor" under these federal and local laws, and it therefore "has the responsibility to ensure that the drivers are paid the legally required wages."  *See* Pls.' Mem. in Supp. of Class Certification, ECF No. 134 [hereinafter Pls.' Mot.], at 38 (citing *Ventura v. Bebo Foods, Inc*., 738 F. Supp. 2d 8, 35 (D.D.C. 2010), and *Perez v. C.R. Calderon Constr., Inc*., 221 F. Supp. 3d 115, 157 (D.D.C. 2016)); *see also id.* at 23–24 (citing D.C. Code § 32-1012(c); *id.* § 32-1303(5)).  Plaintiffs say that MTM's payment of a flat rate per trip, under the terms of its contracts with TSPs, is the reason TSPs are not able to pay drivers in accordance with federal and local laws.  *Id.* at 36–38; *see also* Pls.' Reply in Supp. of their Mot. for Class Cert., ECF No. 155-2 [hereinafter Pls.' Reply], at 5–6.  The flat rate is based only on (1) whether the trips take place within or between geographic zones—MTM divides the District into three zones; (2) whether the trip involves an ambulatory or para-lift wheelchair passenger; and (3) whether the trip occurs

during regular daytime hours.  Pls.' Mot. at 12–13; PEX 2 29–32; *see also* PEX 64, Decl. of Marc Bendick, Jr., Ph.D., [hereinafter Bendick Decl.], at 7–8.  The flat rate does not expressly account for factors like the duration of the trip, the distance of the trip, the time drivers spend waiting for passengers or assisting passengers, or the time spent driving between trips.  Pls.' Mot. at 12–13; PEX 2 at 36–37.

MTM initially moved to dismiss Plaintiffs' Complaint on the basis that it cannot be held liable for the alleged wage violations because it is neither a "joint employer" nor "general contractor."  *See* Def.'s Motion to Dismiss, ECF No. 10 [hereinafter Def.'s Mot.].  The court denied that motion.  *See Harris*, 300 F. Supp. 3d at 243.  MTM also filed its own complaint against third-party transportation providers, *see* Third Party Complaint, ECF No. 24, and the court denied the motions to dismiss that complaint, *see* Order, ECF No. 49.

In July 2018, the court granted Plaintiffs' motion for conditional class certification, *see* Order, ECF No. 48, and the parties proceeded to class certification discovery.  A number of disputes arose during discovery, two of which bear mentioning.  First, Plaintiffs sought from MTM evidence regarding wages paid, hours worked, and other information concerning drivers on the theory that, through its contracts, MTM had the right to demand such information from the TSPs. *See* 7/18/2018 Hr'g Tr., ECF No. 52, at 14–15; Joint Status Report on Class Not., ECF No. 54, at 2; 8/23/2018 Hr'g Tr., ECF No. 71, at 5–6.  MTM attempted to obtain these records by document requests and by subpoena.  *See* 4/25/19 Hr'g Tr., ECF No. 128 [hereinafter 4/25/19 Hr'g Tr.], at 38–40.  However, as reported at the hearing on class certification, MTM's subpoenas resulted in the production of very limited information.  7/16/2020 Draft Hr'g Tr., at 6–7.

Plaintiffs also sought the production of MTM assignment sheets and trip logs, that is, records of each trip performed and the information relevant to the completion of the trip, such as

the pick-up and drop-off times, pick-up and drop-off addresses, and member names.  Pls.' Mot. at

36.  When MTM protested that the trip logs were too voluminous to produce, Plaintiffs asked the

court to order MTM to produce a statistically representative sample of the assignment sheets and

trip logs.  *See* Mot. for Discovery, ECF No. 118.  In response, MTM informed the court that it

routinely purges assignment sheets from its files, so records reflecting past trip assignments "do

not exist."  Mem. in Opp'n to Mot. for Discovery, ECF No. 120, at 2; *see also* 4/25/19 Hr'g Tr.,

at 30.  MTM also argued that assignment sheets and trip logs would not be relevant to class

certification.  Mem. in Opp'n to Mot. for Discovery at 2; *see also* 4/25/19 Hr'g Tr., at 19–20.

Ultimately, Plaintiffs agreed to defer resolving the dispute, pending MTM's response to their

motion for class certification.  4/25/19 Hr'g Tr., at 35–36.

Plaintiffs moved for class certification on July 26, 2019.  *See* Pls.' Mot. for Class Cert.,

ECF No. 130-2 [hereinafter Pls.' Mot.].  MTM opposed, *see* Def.'s Opp'n to Pls.' Mot., ECF No.

142-2 [hereinafter Def.'s Opp'n], and moved to strike the declaration of Plaintiffs' Expert,

Dr. Marc Bendick, *see* Def.'s Mot. to Strike Decl. of Marc Bendick, ECF No. 143 [hereinafter

Def.'s Mot. to Strike].  Plaintiffs in turn moved to strike the declaration of Christina Gunseor and

the accompanying exhibits, on the ground that her declaration relied on trip records and trip logs

that MTM had failed to produce during discovery.  *See* Pls.' Mot. to Strike the Decl. of Christina

Gunseor and Exhibits Thereto, ECF No. 157, Mem. in Supp., ECF No. 157-2, at 2.  The court

heard argument on Plaintiffs' motion for class certification on July 16, 2020.  *See generally*

7/16/2020 Draft Hr'g Tr.

## II.    LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure, which governs class certification, permits

certification only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to meeting these requirements, a class must satisfy at least one of the three subsections of Rule 23(b). Here, Plaintiffs seek certification under subsection (b)(3), which is satisfied when "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A court evaluating a proposed class under (b)(3) must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id*. Alternatively, Plaintiffs seek certification under Rule 23(c)(4), which provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).[2]

The party seeking class certification must demonstrate that the requirements of Rule 23 are met by a preponderance of the evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

---

[2] This provision is the subject of vigorous debate among courts and commentators. *See* discussion *infra* Section III.C.

"[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," and that "[a]ctual, not presumed, conformance with Rule 23(a) remains indispensable." *Id.* at 350–51 (cleaned up). At the certification stage, an inquiry into the merits of the claims may be considered "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 466 (2013).

## III.   DISCUSSION

The court begins with an analysis of the Rule 23(a) factors before turning its attention to the criteria for certification of a class under Rule 23(b)(3). The court then considers Plaintiffs' request for class certification with respect to particular issues under Rule 23(c)(4).

### A.   Rule 23(a)

#### 1.   Numerosity

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity does not "impose[ ] [an] absolute limitation[ ]," but rather "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Courts in this District generally find that numerosity is satisfied and that joinder is impracticable where a proposed class has at least forty members. *See Cohen v. Chilcott*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007); *Bynum v. District of Columbia*, 214 F.R.D. 27, 32–33 (D.D.C. 2003). Plaintiffs need not provide the exact number of potential class members to satisfy the requirement, but can provide an estimate supported by a reasonable basis to believe it to be accurate. *Bynum*, 214 F.R.D. at 32–33.

Here, notice was issued to 862 potential class members whom MTM identified as having provided NEMT services to its clients during the period covered by the FLSA collective action.

MTM does not dispute these numbers and makes no arguments against numerosity in its opposition to class certification. The court therefore finds that the proposed class contains sufficient numbers to make joinder impracticable and satisfies the numerosity requirement of Rule 23(a)(1).

### 2.    *Commonality*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has explained that commonality requires that the plaintiffs' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "A plaintiff's burden is to 'bridge the gap' between her individual claim and 'the existence of a class of persons who have suffered the same injury as that individual.'" *Moore v. Napolitano*, 926 F. Supp. 2d 8, 29 (D.D.C. 2013) (quoting *General Telephone Co. of the Sw. v. Falcon*, 457 U.S. 147 (2013)). Plaintiffs need only show that one issue is common to all proposed class members in order to satisfy the commonality requirement. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

Plaintiffs argue that the proposed class meets the commonality standard because a number of questions are common to the class, including (1) whether MTM is a joint employer, (2) whether MTM is a general contractor, (3) whether the time class members spent traveling between trips and waiting for clients is compensable, and (4) whether MTM's flat-rate payment system accounts for all compensable time. Pls.' Mot. at 18.

MTM counters that Plaintiffs flunk the commonality requirement because they "have failed to identify a uniform policy to which they and the other members of their proposed class were subjected that explains how or provides the reasons that each member of the proposed class was

allegedly not paid appropriately." Def.'s Mot. at 18. As MTM sees it, there is no uniform class-wide policy as to drivers' wages and hours because the drivers' wages were structured differently, they were paid at different rates, had different driving assignments, and their work hours were set differently depending on which TSP employed them. *Id.* at 21.

The presence of these individualized issues does not defeat the element of commonality. Recall, to satisfy the element of commonality requires plaintiffs to show only one issue common to the class. *See Tyson Foods*, 136 S. Ct. at 1045. Here, there are at least two: (1) Whether MTM qualifies as a "joint employer" and (2) whether MTM qualifies as a general contractor for purposes of establishing joint liability for any unpaid wages under District of Columbia law. *See Harris*, 300 F. Supp. 3d at 246–47 (describing Plaintiffs' alternative theories of liability under District of Columbia wage statutes). Those issues are capable of class-wide resolution "in one stroke," as their resolution will depend on common evidence concerning, among other things, MTM's hiring, training, and performance requirements. *Wal-Mart*, 564 U.S. at 350; *see also Harris*, 300 F. Supp. 3d at 243–44 (describing the type of evidence relevant to a joint employer determination).

MTM resists this conclusion. It asserts that questions about MTM's status as a joint employer or a general contractor are not the type of "common question" that satisfies Rule 23(a)(2), and are more like the question "Do all of us plaintiffs indeed work for Wal-Mart" that the Supreme Court offered would be insufficient to obtain class certification in *Wal-Mart*. *See* Def.'s Opp'n at 17–18. But the comparison to *Wal-Mart* is strained, to say the least. The question posed in that case was whether female Walmart employees had been discriminated against by virtue of their sex, an issue which was not common to all class members since plaintiffs had not bridged the gap between their individual experiences of discrimination and a "general policy" of discrimination that was applicable to all class members. *See Wal-Mart*, 564 U.S. at 353. Here, on

the other hand, the questions concerning MTM's status as a joint employer or general contractor are *legal* questions that do not depend on individualized facts regarding MTM's relationships with specific plaintiffs.  And once answered, those questions would "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350. Stated another way, resolving whether MTM is a joint employer or general contractor would "generate common *answers* apt to drive the resolution of the litigation."  *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 132 (2009)).  If MTM is neither a joint employer nor a general contractor, that would bring an end to the case—it cannot be held liable under District of Columbia law for underpayment of wages.  On the other hand, if MTM does qualify as a joint employer or a general contractor, that legal conclusion would answer a threshold question in Plaintiffs' favor that is necessary to make out their claims.  MTM's legal status as joint employer or general contractor thus presents a quintessential "common question" under Rule 23(a)(2).

### 3.   *Typicality and Adequacy*

The third and fourth prerequisites of Rule 23(a) concern the suitability of the class representatives.  Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This typicality requirement ensures "that the class representatives have suffered injuries in the same general fashion as absent class members."  *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (quoting *Thomas v. Albright*, 139 F.3d 227, 228 (D.C. Cir. 1998)).  "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory." *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997) (quoting *EEOC v. Printing Indus.*, 92 F.R.D. 51, 54 (D.D.C. 1981)).  Relatedly, Rule 23(a)(4) requires a

finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Two criteria for determining the adequacy of representation are generally recognized: 1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and 2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997) (quoting *Nat'l Ass'n of Reg'l Medical Programs v. Mathews*, 551 F.2d 340, 345 (D.C. Cir. 1976)).

Plaintiffs argue that typicality is satisfied because the claims of named plaintiffs Isaac Harris, Darnell Frye, and Franklin "arise from the same course of conduct that gives rise to the claims of the absent class members, namely MTM's system of employing NEMT drivers through subcontractors and paying the subcontractors a flat rate per trip without regard to the time the drivers spent working." Pls.' Mot. at 40. As to adequacy, Plaintiffs submit that the named Plaintiffs are not antagonistic to the unnamed class members and are able to vigorously represent the interests of the class. *Id.* at 42.

MTM, however, raises a number of objections to the named plaintiffs, including that (1) Frye should have been disqualified as a driver from the NEMT program because of a domestic violence conviction; (2) Harris has filed and settled claims against one TSP, Star Transportation; and (3) Frye and Harris allegedly "submitted falsified driving trip records which cast serious doubt on their credibility and ability to serve as a class representative." Def.'s Opp'n at 42–45.

These objections are unpersuasive. First, none of MTM's assertions have any bearing on typicality, which is concerned with distinctions that "differentiate the 'claims or defenses' of the representatives from those of the class." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). Nor are allegations that potential class representatives lack character or credibility relevant to adequacy

unless the allegations reveal a conflict among the class members or an inability to vigorously pursue the case. *See Johns v. Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992). The allegations levied against Frye and Franklin do not meet this standard. Finally, that Harris may have settled claims against Star Transportation says nothing about MTM's liability for underpayment of wages. While it is possible that Harris's settlement with Star may be a defense as to damages as to him, "the ultimate inability to maintain an individual claim for damages due to a legitimate defense to that named plaintiff's claim . . . does not create a conflict of interest that destroys the adequacy of class representatives." *Little v. Wash. Metropolitan Area Transit Auth.*, 249 F. Supp. 3d 394, 422 (D.D.C. 2017).

Accordingly, the court finds the named plaintiffs claims are typical of those of the class and that the named plaintiffs are adequate representatives of the class. Additionally, Plaintiffs' counsel are experienced in class actions and other complex litigation, Pls.' Mot. at 42, and thus adequate to represent the class. MTM does not contend otherwise.

### B.   Rule 23(b)(3)

To certify a class under Rule 23(b)(3), as Plaintiffs request here, the court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The court takes these requirements in reverse order, starting with superiority.

#### 1.   *Superiority*

Rule 23(b)(3)'s superiority requirement is intended to "ensure[ ] that resolution by class action will 'achieve economies of time, effort, and expense and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other

undesirable consequences.'" *Vista Healthplan, Inc. v. Warner Holdings Co.*, 246 F.R.D. 349, 359–60 (D.D.C. 2007) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). Superiority is met when a court determines that a class action is superior to other available means of adjudication.  In making that determination, courts consider "the class members' interests in individually controlling the prosecution or defense of separate actions," "any litigation concerning the controversy already begun by or against class members," "the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

MTM argues that Plaintiffs have failed to satisfy the superiority requirement because (1) the claims of each class member are not "so small that each individual would lack the motivation to pursue such a claim" in individual litigation; (2) at least three drivers have previously pursued claims against MTM and/or their subcontractors; and (3) "Plaintiffs have failed to identify any viable common method of adjudicating the claims of class members on a common, class-wide basis."  Def.'s Opp'n at 52–55.

MTM's arguments are unpersuasive.  First, superiority is often found when use of the class action device would "enable[ ] 'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'"  2 Newberg on Class Actions § 4:65 (5th ed. 2020) (quoting *Amchem*, 521 U.S. at 617); *see also Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 162 (D.D.C. 2014) ("[C]lass actions are appropriate where many individuals have small claims, and otherwise would not be incentivized to pursue them.").  Here, even if some class members' claims may be large enough to incentivize such persons to pursue individual claims, that is not evidently true for most or even many class members.  Class-wide resolution of certain central questions—particularly MTM's status as a joint

14

employer or general contractor—is superior to litigating that question in dozens, if not hundreds, of individual actions.  Second, that "no fewer than three drivers," Def's Opp'n at 53, out of a potential class of more than 800, have already brought individual claims against MTM and/or its subcontractors does not render this class action against MTM an undesirable forum for litigation. Again, one of the key questions presented in this case is whether MTM is jointly liable with its subcontractors for underpaying drivers.  That question would not be contested in separate suits brought solely against subcontractors, and though some claims have been lodged against MTM, deciding the joint liability question in a single case covering an entire putative class is superior to multiple individual actions.  Finally, as to MTM's contention that this class action would be unmanageable because of Plaintiffs' failure to identify a common method of adjudicating claims, this concern crosses over into the predominance analysis, which the court discusses next.

### 2.    *Predominance*

The second requirement of Rule 23(b)(3) is that common issues predominate over issues that affect only individual class members.  "The predominance requirement is meant to assess whether the class's interests are 'sufficiently cohesive to warrant adjudication by representation.'" 2 Newberg on Class Actions § 4.49 (5th ed. 2020) (quoting *Amchem*, 521 U.S. at 623).  Although this inquiry is related to the commonality requirement, "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding."  *Comcast Corp. v. Behrand*, 569 U.S. 27, 34 (2013).

"[T]he predominance analysis logically entails two distinct steps—the characterization step and the weighing step."  2 Newberg on Class Actions § 4:50 (5th ed. 2020).  First, the court must "characterize the issues in the case as common or individual . . . primarily based on the nature of the evidence."  *Id*.  "Evidence is considered 'common' to the class if the same evidence can be

used to prove an element of the cause of action for each member," but evidence is individualized when "members of the proposed class would need to present evidence that varies from person to person." *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012). Second, the court must "compare the issues subject to common proof against the issues subject solely to individualized proof to *assess* whether the common issues predominate." 2 Newberg on Class Actions § 4:50 (5th ed. 2020). This comparison is "more of a qualitative than quantitative" concept. *Id.* At this weighing step, the court must keep in mind that "common liability issues are typically far more important and contested and the individual damage calculations often formulaic." *Id.* § 4:54 (5th ed. 2020); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." (cleaned up)). "[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification." *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984); *see also* 2 Newberg on Class Actions § 4:54 (5th ed. 2020) ("[C]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.").

Plaintiffs argue that two issues "underlie every putative class member's claim": (1) whether MTM is a joint employer of the class members, and (2) whether MTM's flat-rate payment system "failed to ensure that the drivers were paid for all compensable time." Pls. Mot. at 43–44. They assert that they can answer these questions through representative proof common to the class, including with "MTM's policy documents, testimony from MTM's representative, and expert economic analysis of MTM's universal D.C. rate scheme." *Id.* at 44. The court agrees that common evidence can resolve the first question, but not the second. Individualized proof, as

opposed to representative evidence, ultimately will be necessary to determine whether MTM violated wage laws with respect to any particular class member, and that individualized proof will overwhelm the common questions presented.

i.      Whether MTM is a "joint employer"

As this court explained in its Memorandum Opinion denying MTM's motion to dismiss, the D.C. Circuit has not specified a test for determining whether an alleged employer is a "joint employer" for purposes of the FLSA. *Harris v. Med. Transp. Mgmt., Inc.*, 300 F. Supp. 3d 234, 240–41 (D.D.C. 2018). However, in a case that considered whether a worker is a "consultant" or an "employee" for purposes of the FLSA, the Circuit explained that the question turns on the "economic reality" of the employment arrangement rather than "technical concepts." *Morrison v. Int'l Programs Consortium, Inc*., 253 F.3d 5, 11 (D.C. Cir. 2001) (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 32–33 (1961)). The Circuit instructed courts to examine "the extent to which [four] typical employer prerogatives govern the relationship between the putative employer and employee": (1) the power to hire and fire employees; (2) the ability to supervise and control employees' work schedules or conditions of employment; (3) the authority to determine the rate and method of payment; and (4) the maintenance of employment records. *Id*. (citing *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)). These same factors would apply to the joint employer inquiry for purposes of Plaintiffs' District of Columbia wage claims. *See Wilson v. Hunam Inn., Inc.*, 126 F. Supp. 3d 1, 5–6 (D.D.C. 2015) (stating that courts construe the FLSA and the D.C. Minimum Wage Act "coterminously for purposes of determining who is liable as an employer").

Common evidence is likely to resolve the joint employer question. For example, Plaintiffs no doubt will look to MTM's policy documents and service agreements with subcontractors, as

well as testimony by MTM employees regarding its hiring and training practices and the rules and standards MTM requires drivers to follow.   Plaintiffs will use this evidence—which would be applicable to all class members—to show that MTM has the power to hire and fire drivers, and has the authority to control or affect the conditions of the drivers' employment.   None of this is to say that the court has reached any conclusion about the merits of Plaintiffs' theory of joint employment.  But what is clear, however, is that the joint liability question can be resolved through the presentation of proof common to the class, and not individualized evidence.   That question, at least, meets the predominance requirement of Rule 23(b)(3).

ii.   <u>Whether MTM's flat-rate payment system failed to ensure that the drivers were paid for all compensable time</u>

The court reaches a different conclusion, however, as to whether Plaintiffs have offered class-wide proof supporting the second issue underpinning their claims: whether MTM's payment system is responsible for underpayment of wages.   The crux of Plaintiffs' theory of liability is that, because MTM is a joint employer (or a general contractor), it has "an affirmative obligation to ensure that its employees are paid the D.C. minimum wage, D.C. Code §§ 32-1001, *et seq*., the D.C. living wage, D.C. Code §§ 2-220.01, *et seq*., and the applicable prevailing wage rates under the Service Contract Act, D.C. Code § 32-1302, 41 U.S.C. § 6703." Pls.' Reply at 4.  MTM failed in this obligation, according to Plaintiffs, because it utilizes a flat-rate payment system that does not compensate drivers for time between trips, time in traffic, or time waiting for and assisting clients.   Plaintiffs present testimony from class members and a methodology developed by their expert, Dr. Marc Bendick, as class-wide proof.

MTM, on the other hand, insists that individualized inquiries will be necessary to determine which class members were underpaid, and thus whether MTM is liable.   In MTM's view, these inquiries would overwhelm the litigation because wide variations of proof exist within the class

on key aspects of establishing liability, including: (1) the different rate MTM negotiated with each TSP; (2) the compensation structure for each class member (hourly, daily, per trip, weekly, or biweekly); (3) how much each class member was compensated; (4) the hours each class member worked; and (5) the years in which each class member worked and the minimum wage at those times. *See* Def.'s Opp'n at 51. "The need for such an extensive individualized inquiry as to each class member," MTM submits, "is fundamentally irreconcilable with Plaintiffs' contention that common issues predominate such that certification is permissible under Rule 23(b)(3)." *Id.* The court agrees.

The record reflects wide variation among putative class members across numerous metrics that would be relevant to assessing MTM's liability as to each class member. Putative class members are employed by over eighty TSPs, each of whom negotiated an individualized rate structure with MTM. *See* Bendick Decl. at 7 (providing average rates of payment between MTM and 77 TSPs). Variations are particularly striking as to putative class members' pay. For example, some reported that they were paid hourly and received overtime, *see, e.g.*, PEX 13 at 2, while others were paid hourly but received no overtime, *see, e.g.*, PEX 17 at 2; PEX 15 at 2–3; PEX 28 at 3; PEX 35 at 2, and others were paid per trip and received no overtime, *see, e.g.*, PEX 37 at 2; PEX 26 at 2; PEX 27 at 2; PEX 45 at 3; PEX 49 at 2. Some putative class members were paid weekly, *see, e.g.*, PEX 18 at 2; PEX 20 at 2; PEX 34 at 2; PEX 47 at 2, others bi-weekly, *see, e.g.*, PEX 23 at 2, and still others daily, *see, e.g.*, PEX 19 at 2; PEX 25 at 2. One reported receiving wages as high as $1,200 every two weeks, *see* PEX 13 at 2, while another reported wages as low as $5 per trip, or what amounted to $1.89 to $2.38 per hour, *see* PEX 27 at 2. Some putative class members were compensated for break periods, *see, e.g.*, PEX 18 at 3, but others were not, *see, e.g.*, PEX 17 at 3. And putative class members also reported working different numbers of hours, not

only when compared to one another, *compare* PEX 17 at 2 (reporting up to 90 hours per week) *with* Def.'s Unopposed Mot. for Leave to File Excess Pages, ECF No. 142, Ex. 6, ECF No. 142-8 [hereinafter DEX 6][3] at PDF p. 45 (providing compensation for 6 hours over a two-week pay period), but also across different pay periods, *see* DEX 6 at PDF pp. 49, 51 (a single putative class member might work only 9 hours in one pay period but 71 hours in a different pay period).  Many putative class members were employed by several different TSPs at different points in time, *see e.g.*, PEX 17 at 1; PEX 18 at 1; PEX 22 at 1; PEX 27 at 1, and others reported working for a single TSP but being paid at different rates at different times, *see, e.g.*, PEX 12 at 2; PEX 20 at 2, PEX 28 at 2–3, PEX 32 at 2–3.  And, because the proposed class spans six years, the D.C. Minimum Wage, and D.C. Living Wage have also changed several times during this period.  *See* Bendick Decl., Table A.  These differences between putative class members overwhelm the issues common to the class.  *See Little*, 249 F. Supp. 3d at 425 (holding that individual issues predominate where the factfinder would need to evaluate, among other things, reasons for failing to hire a class member, what steps were required before extending an employment offer, and whether a class member obtained another position thereby mitigating potential backpay damages).

Plaintiffs attempt to gloss over these differences by reiterating that they have "identified a common MTM policy—paying a flat rate for trips that does not account for all working time— that led to the harm of underpayment of wages."  Pls.' Reply at 5.  Citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. at 1036, Plaintiffs contend that any differences regarding the "the precise number of hours worked each day, the number of trips per day, and the rate paid to each driver . . . will be relevant only to calculating the damages owed to each driver" and "do not impede Plaintiffs ability to demonstrate liability with evidence common to the class."  *Id.* at 20–21.  But

---

[33] Defendant MTM's exhibits to its opposition to Plaintiffs' motion for class certification, noted as "DEX," are found at ECF No. 142.

the differences between class members presented in *Tyson Foods* are a far cry from the glaring and pervasive differences between class members identified here.  In *Tyson Foods*, the Court held that it was permissible for the plaintiffs to "introduce a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records" in order to prove their overtime claim.  136 S. Ct. at 1047.  The plaintiffs relied on the opinion of an industrial relations expert who conducted 744 videotaped observations to determine the average time class members had spent donning and doffing required protective equipment in different departments.  *Id*. at 1043.  The employer had not kept records of its employees' donning and doffing time but did have records of the class members' time at their work stations, which another expert used, in combination with the estimated donning and doffing times, to determine how many class members had worked overtime without receiving overtime compensation.  *Id*.  These minor variations in the time required to don and doff protective equipment in *Tyson Foods* are of a different type altogether than the variations in this case, which implicate not just differences in uncompensated time (i.e. rest breaks, breaks between trips, overtime), but also differences in pay structure, pay rates, hours worked, and differences in the rates MTM paid each TSP.  Such differences will "give rise to a plethora of individualized inquiries relating to the determination of the amount of compensable work Plaintiffs performed."  *Senne v. Kansas City Royals Baseball Corp.*, 315 F.RD. 523, 586 (N.D. Cal. 2016); *see also Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1194 (11th Cir. 2009) (affirming that individualized issues predominate where proving or disproving claims about unpaid breaks would require individualized inquiries into why packages were scanned during unpaid breaks).

Nor are Plaintiffs' offerings of class-wide proof sufficient to show liability as to the class. Plaintiffs contend they will be able to prove their claims with common proof by using representative data.  Pls.' Mot at 14.  They offer a "Driver Data Chart" based on an interview

survey of 40 drivers,  PEX 65, Decl. of Seth Groveunder [hereinafter Groveunder Decl.] at 1, as well as declarations from 39 of the surveyed drivers, *see generally* Plaintiffs' Exhibits 8–50.  This collection of drivers is not a representative sampling of the class but consists of 33 opt-in Plaintiffs who had previously submitted interrogatory responses to MTM under a limited discovery agreement between the parties, and an additional seven drivers who filed consent forms to join the FLSA collective action.  *Id.* at 1–2.  Plaintiffs again rely on the Supreme Court's recent decision in *Tyson Foods v. Bouaphakeo*, in support of their position that such representative evidence is permissible to prove liability and damages where, as here, an employer has failed to keep adequate records.  But, once again, *Tyson Foods* does not remedy the problems with Plaintiffs' offer of proof.  There, the Court explained

> [a] representative or statistical sample, like all evidence, is a means to establish or defend against liability.  Its permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is *reliable* in proving or disproving the elements of the relevant cause of action.

136 S. Ct. at 1046 (emphasis added).  While representative testimony by class members can be used to establish liability in wage cases, *see Monroe v. FTS USA LLC*, 860 F.3d 389, 408, 409 (6th Cir. 2017) (surveying cases); *Morgan v. Family Dollar Store, Inc.*, 551 F.3d 1233, 1278–79 (8th Cir. 2008) (same), the problem with Plaintiffs' representative testimony is that MTM has proffered evidence that directly contradicts various class members' representations.  For example, class member Lenora Adams reported that, while driving for one transportation service provider, MBI Logistics, from April 2017 through November 2018, she "regularly worked at least 55 hours per week" and did not receive overtime pay.  PEX 15 at 2–3.  However, MTM submitted MBI timecards from September through November 2018 that indicate Adams worked varying hours per week, ranging from 0 hours to 16 hours to 44 hours, but more often than not worked fewer than

40 hours each week.  DEX 6 at PDF pp. 26–29.  Moreover, an earnings statement from November 30, 2018, shows that Adams earned $1,296.72 in overtime during that year.  *Id.* at PDF p. 35. Similarly, class member Cynthia West testified that she "regularly worked around 75 hours a week" for MBI between March 2016 and November 2016, PEX 50 at 1–2, but MBI timecards show that West worked fewer than 80 hours for nearly every two-week pay period from March 2015 to July 2016, including working as few as 6 and 9.75 hours during two pay periods.  DEX 6 at PDF pp. 44–51.  Likewise, class member Michael Branch testified that MBI did not pay him overtime, PEX 18 at 2, but MTM submitted an earnings statement dated November 30, 2018, that indicates Branch had earned $553.81 year-to-date in overtime pay, DEX 6 at PDF p. 41.

These discrepancies between what class members remember as to their pay and hours, often for positions held years ago, and the actual timecards and earnings statements from that period highlight the perils of relying on class members' direct testimony.  While the Supreme Court has admonished that when an employer violates its statutory duty to keep proper records, the employee should not be penalized "by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work," the Court has also made clear that plaintiffs must "prove[ ] that [they have] in fact performed work for which [they were] improperly compensated" and "produce [ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds as stated in Integrity Staffing Sols. v. Busk*, 574 U.S. 27, 32 (2014).   In a case such as this, where differences in pay rates and hours between class members is particularly stark, Plaintiffs have not demonstrated that relying on class member testimony as representative evidence is a reliable method for proving liability on a class-wide basis. *Tyson Foods,* 136 S. Ct. at 1048 ("Representative evidence that is statistically inadequate or based

on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked.").

Presumably recognizing the shortcomings of relying solely on class member testimony, Plaintiffs also offer a methodological analysis crafted by their expert economist, Dr. Marc Bendick.  Plaintiffs argue that Dr. Bendick's methodology shows "that MTM's policies and practices of refusing to pay for certain categories of compensable time is insufficient to sustain the legally required wages."  Pls.' Mot. at 14.  Specifically, Dr. Bendick's analysis attempts to determine what wage rates a TSP could have paid its drivers given MTM's policy of compensating the TSPs using a flat-rate.  Bendick Decl. at 4.  To that end, Dr. Bendick assessed a "reasonable, conservative estimate" of the revenue an average TSP earned from MTM as well as a "reasonable, conservative estimate of the average TSP's non-driver costs," and compared those figures with an average of compensable hours worked by drivers.  *Id.*  at 4–5.  Dr. Bendick concluded that the maximum wage rate a TSP could pay its drivers while remaining in business was $7.63 per hour, well below the Federal Minimum Wage, the District of Columbia Minimum Wage, and the District of Columbia Living Wage.  *Id.* at 5–6.  Dr. Bendick's analysis is based on interviews with a "convenience sample" of 40 drivers employed by 46 TSPs, or 56.8% of the 81 TSPs.  *Id.* at 2 n.1.

MTM raises a number of objections to Dr. Bendick's analysis, *see generally* Def.'s Mot. to Strike, but even setting aside these objections, Dr. Bendick's analysis on its face fails to propose a method by which a fact-finder could determine liability on a class-wide basis.  Plaintiffs may show that representational evidence like Dr. Bendick's analysis "is a permissible method of proving classwide liability [ ] by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action."  *Tyson*, 136 S. Ct. at 1046–47.  Or, as one district court put it, in order for plaintiffs to use representative testimony "in the form

24

of an expert report, the Court must ask whether the experiences of a subset of employees can be probative as to the experiences of all of them." *Sullivan v. PJ United*, 362 F. Supp. 3d 1139, 1152 (N.D. Ala. 2018), *vacated in part on reconsideration by Sullivan v. PJ United, Inc.*, 7:13-cv-01275-LSC, 2018 WL 6220092 (N.D. Ala. Aug. 28, 2018).  But here, not only is Dr. Bendick's methodology based on a non-representative sampling of drivers and TSPs, it requires a logical leap to conclude that MTM's flat-rate compensation policy is responsible for the underpayment for any specific driver.  Other factors, such as variable overhead costs or compensation or profits paid to TSP owners, could account for or contribute to the underpayment of a particular driver.  Moreover, Dr. Bendick's analysis relies exclusively on the memories of drivers for critical inputs, such as wage rates and hours worked, the reliability of which MTM has shown at this stage is not free of doubt.  While Dr. Bendick's report is an interesting academic exercise, at most it can only corroborate that this industry operates with low margins, rendering individual drivers vulnerable to an economic ecosystem that can make it challenging for TSPs to pay a living wage.  It cannot, however, be generalized to the practice of over 80 different TSPs and the potential underpayment of over 800 class members.

Accordingly, because questions of individualized proof ultimately will predominate over those issues based on common evidence to establish MTM's liability, Plaintiffs have not carried their burden of certifying a class under Rule 23(b)(3).

## C.    Rule 23(c)(4)

As an alternative to certification under Rule 23(b)(3), Plaintiffs suggest, almost in passing, that the court may "certify only the liability issue under Rule 23(c)(4)."  *See* Pls.' Mot. at 50. Rule 23(c)(4) provides "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  *See generally* 2 Newberg on Class Actions § 4:38 (5th

ed. 2020).  Some courts have interpreted this provision to grant them discretion to certify a class on an issue such as liability, "so long [as] the proposed class satisfies the requirements of Rule 23(a) and (b) with respect to [that issue]."  *Little*, 249 F. Supp. 3d at 425–26 (second alteration added) (quoting *Houser v. Pritzker,* 28 F. Supp. 3d 222, 253–54 (S.D.N.Y. 2014)); *Nassau Cty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006) (holding that a district court has discretion to certify a class as to liability); *cf. In re Brewer*, 863 F.3d 861, 876 (D.C. Cir. 2017) (acknowledging that certification of a Rule 23(c)(4) liability class is one of several discretionary tools of the trial court).  But that interpretation is not without controversy.

Circuits have split on the proper application of Rule 23(c)(4) given its inherent tension with Rule 23(b)(3)'s requirement that common issues predominate.  *See* 2 Newberg on Class Actions § 4:91 (5th ed. 2020) ("[C]ourts and commentators are sharply split on when issue certification is proper under Rule 23(c)(4).").  "The Fifth Circuit has adopted a 'strict application' of Rule 23(b)(3)'s predominance requirement," *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006), requiring "a cause of action, as a whole, [to] satisfy the predominance requirement of (b)(3)," and viewing "(c)(4) [merely as] a housekeeping rule that allows courts to sever the common issues for a class trial," *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996) (admonishing that "manufactur[ing] predominance" where it is otherwise absent portends "automatic certification in every case where there is a common issue, a result that could not have been intended").  As discussed above, Plaintiffs have not carried their burden of showing that common issues predominate over issues that affect only individual class members on their wage claims *as a whole*.  The Second Circuit, to the contrary, takes a "broad view"[4] of issue

---

[4] For in-depth analysis of what he dubs the "broad" and "narrow" views of issue certification, see Professor Rubenstein's discussion in 2 Newberg on Class Actions § 4:91 (5th ed. 2020).  *See also In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. 652, 664–65 (D. Kan. 2013) (discussing circuit split and collecting cases).

certification, arguing that "the Fifth Circuit's [narrow] view renders subsection (c)(4) virtually null." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226–27 (2d Cir. 2006) ("[A] court may employ subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement.").[5] Others still have looked to the American Law Institute's ("ALI") *Principles of the Law of Aggregate Litigation* for guidance on the proper application of Rule 23(c)(4). *See, e.g.*, *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011); *see also* 2 Newberg on Class Actions § 4:91 (5th ed. 2020) (discussing merits of this approach and providing cases). The ALI advises that "issue certification is appropriate when resolution of the common issue would 'materially advance the resolution of multiple civil claims by addressing the core of the dispute in a manner superior to other realistic procedural alternatives, so as to generate significant judicial efficiencies . . . .'" 2 Newberg on Class Actions § 4:91 (5th ed. 2020) (quoting Principles of the L. of Aggregate Litig. § 2.02 (Am. L. Inst. 2010)).[6] The ALI approach involves weighing eight "non-exclusive" factors (none of which the parties have addressed here) to determine whether certification is appropriate under Rule 23(c)(4). *See Gates*, 655 F.3d at 273. Neither the Supreme Court nor the D.C. Circuit have weighed in on the scope of Rule 23(c)(4).[7]

Certifying an issue class could "materially advance the resolution" of this case. For instance, certifying a class as to whether MTM is a "joint employer" and/or a "general contractor" for purposes of determining whether it is jointly liable for unpaid wages under federal and District

---

[5] A majority of Circuits seem to agree with this "broad view." *See* 2 Newberg on Class Actions § 4:91 (5th ed. 2020) ("Three circuits (the Second, Sixth, and Ninth) have expressly endorsed the broad view, and four other circuits (the Third, Fourth, Seventh, and Eighth) have indicated support for it." (internal citations omitted)).

[6] *Cf. In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008) (declining to certify issue classes because they "would do little to increase the efficiency of the litigation").

[7] In March 2019, the Supreme Court denied a petition for *certiorari* "in a case in which the Sixth Circuit affirmed the use of issue classes despite the absence of predominantly common issues across the whole case[,] arguably provid[ing] further legitimacy to the [practice]." 2 Newberg on Class Actions § 4:91 (5th ed. 2020) (citing *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019)).

of Columbia wage laws has some appeal.  Those questions are potentially dispositive.  If MTM is neither a joint employer nor a general contractor, the case would come to an end.  But if MTM is found to be a joint employer or a general contractor, it would be liable for the underpayment of wages to an individual class member if that individual can demonstrate a violation of District wage laws.

Regardless, because neither party has briefed the legal complexities associated with issue certification and its interplay with Rule 23(b)(3), it would be premature for the court to certify an issue class without further input from the parties.  Accordingly, Plaintiffs' request to certify a class under Rule 23(c)(4) is denied without prejudice.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the court denies Plaintiffs' Motion for Class Certification, ECF No. 134.  The court also denies as moot Defendant's Motion to Strike, ECF No. 143, and Plaintiffs' Motion to Strike, ECF No. 157.

Dated: September 24, 2020

Amit P. Mehta
United States District Judge