**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                                          |     |                          |
| ---------------------------------------- | --- | ------------------------ |
| **ISAAC HARRIS, et al.,**                | )   |                          |
|                                          | )   |                          |
| **Plaintiffs,**                          | )   |                          |
|                                          | )   |                          |
| **v.**                                   | )   | **Case No. 17-cv-1371 (APM)** |
|                                          | )   |                          |
| **MEDICAL TRANSPORTATION**               | )   |                          |
| **MANAGEMENT, INC.,**                    | )   |                          |
|                                          | )   |                          |
| **Defendant.**                           | )   |                          |
|                                          | )   |                          |

_____

**MEMORANDUM OPINION AND ORDER**

**I.      INTRODUCTION**

Defendant Medical Transportation Management, Inc. ("MTM") is a private company that contracts with the District of Columbia to deliver non-emergency medical transportation ("NEMT") services to eligible D.C. Medicaid recipients.  Plaintiffs are drivers who transport Medicaid patients under the MTM contract with the District.  MTM does not employ the Plaintiff-drivers directly.  It instead contracts with dozens of independently owned transportation providers, who in turn employ the drivers to fulfill MTM's contractual obligations.  Plaintiffs contend that they have not been paid the wages that they are due, and they assert that MTM is liable for the underpayment, even though it is not their direct employer.  Plaintiffs bring claims under the Fair Labor Standards Act ("FLSA"), 20 U.S.C. § 201 *et seq*., and District of Columbia wage-and-hour laws, *see* D.C. Code § 32-1001 (Minimum Wage Act); *id.* § 2-220.01 *et seq.* (Living Wage Act); *id.* § 32-1302 (Wage Payment and Collection Law).

On January 19, 2024, following remand from the D.C. Circuit, this court certified an issue class consisting of "[d]rivers who have provided [NEMT] services in the District of Columbia

under any contract between the District of Columbia and MTM at any time from . . . July 13, 2014, through the date on which notice [was] issued affording the right to opt out of the class." *See* Mem. Op. & Order, ECF No. 240; Order Amending Class Cert. Order, ECF No. 245. The court identified two issues that were suitable for class-wide resolution: (1) "whether MTM qualifies as a joint employer of the putative class members" for purposes of the FLSA and D.C. wage laws, and (2) "whether MTM is a general contractor that is strictly liable for any violations of [] [D.C.] wage laws committed by its subcontractors." *See* Mem. Op. and Order, ECF No. 240, at 1–3 (internal quotation marks and alterations omitted).

Plaintiffs now move for summary judgment on these issues, arguing that MTM qualifies as both a joint employer of the drivers and a general contractor to the transportation service provider subcontractors who employ them. *See* Pls.' Mot. for Partial Summ. J., ECF No. 222 [hereinafter Pls.' Mot.]. For the reasons that follow, the court denies the motion as to MTM's status as a joint employer, but grants it as to its status is a general contractor.

## II.    BACKGROUND

### A.    Factual Background

The Social Security Act allows states to "provide for the establishment of a non-emergency medical transportation brokerage program in order to more cost-effectively provide transportation for individuals eligible for medical assistance under [a] State plan who need access to medical care or services and have no other means of transportation." 42 U.S.C. § 1396a(a)(70). The broker must be selected through a competitive bidding process. *Id.* § 1396a(a)(70)(B)(i). The selected broker (1) must have "oversight procedures to monitor beneficiary access and complaints and ensure that transport personnel are licensed, qualified, competent, and courteous"; (2) is subject to auditing and oversight by the state "to ensure the quality of the transportation services provided

and the adequacy of beneficiary access to medical care and services"; and (3) must "compl[y] with" federal regulatory "requirements related to prohibitions on referrals and conflict of interest." *Id.* § 1396a(a)(70)(B)(ii)–(iv).

Since 2007, the District of Columbia has contracted with MTM to administer its NEMT program. *See* Pls.' Mot., Pls.' Stmt. of Material Facts, ECF No. 222 [hereinafter Pls.' Stmt.], ¶ 1; Def.'s Mem. of P&A in Opp'n to Pls.' Mot. for Summ. J., ECF No. 225 [hereinafter Def.'s Opp'n], Def.'s Stmt. of Disputed Material Facts, ECF No. 225-1 [hereinafter Def.'s Stmt.], ¶ 1.[1] The parties have put in evidence two contracts between the District and MTM (the "Contracts")— one from 2014 and one from 2015. *See* Def.'s Stmt., Ex. 1, ECF No. 225-2 [hereinafter 2014 Contract]; *id.*, Ex. 2, ECF No. 225-3 [hereinafter 2015 Contract].[2] Under both, MTM is tasked with "provid[ing] the oversight and monitoring of the day-to-day operations necessary for the delivery of" NEMT services in the District. 2014 Contract ¶ C.3.1.1; 2015 Contract, ¶ C.5.1.1.

MTM has a host of enumerated responsibilities under the Contracts. It must "negotiate and establish" service agreements with transportation service providers ("TSPs") to build a transportation network. 2014 Contract ¶¶ C.1(a), C.3.1.9(a); 2015 Contract ¶¶ C.1(a), C.5.1.11(a). TSPs are privately owned companies that employ drivers to take patients to and from their medical appointments. *See* 2014 Contract ¶¶ C.1.2.48, C.3.2.3.3.1; 2015 Contract ¶¶ C.3.60, C.5.2.3.3.1. MTM cannot itself "own or operate any vehicle to be used" in the NEMT program. 2014 Contract ¶ C.3.1.5; 2015 Contract ¶ C.5.1.5. So, it leans on TSPs preapproved by the District to complete its contractual requirements. *See* 2014 Contract ¶ C.3.2.1.1; 2015 Contract ¶ C.5.2.1.1.

---

[1] The parties often dispute each other's characterization or framing of the material facts in this case without disputing the substance of the underlying documents. The court cites to the actual record where the parties disagree about a fact and cites to their statements of material fact where an issue is undisputed. The court adopts a neutral framing in describing these facts.

[2] Plaintiffs have presented only excerpts of the relevant contracts. *See* Pls.' Stmt., Ex. A, ECF No. 222-1; *id.*, Ex. S, ECF No. 222-19. MTM provided the entire contract, and accordingly the court uses those exhibits.

Although MTM does not itself provide the transportation services, it supplies the administrative backbone for the NEMT program. MTM (1) operates a call center and uses scheduling software to receive transportation requests and dispatch those requests to TSPs; (2) "[m]onitor[s] the overall delivery" of NEMT services by ensuring the vehicles used and the drivers employed to transport patients meet certain legal and contractual requirements; (3) "[m]aintain[s] [a] quality assurance plan . . . and complaint and [g]rievance resolution processes"; and (4) "[p]rovide[s] claims payment and administration" for TSPs. 2014 Contract ¶ C.1; 2015 Contract ¶ C.1.

MTM is subject to certain "mandatory subcontracting requirements." 2015 Contract ¶ H.9.1. The 2015 Contract provides that "[f]or contracts in excess of $250,000, at least 35% of the dollar volume shall be subcontracted to certified small business enterprises." *Id.* ¶ H.9.1.1. MTM was required to submit with its contracting proposal to the District "a notarized statement detailing its subcontracting plan." *Id.* ¶ H.9.2. MTM's "Subcontracting Plan," dated November 19, 2015, contained "Subcontractor Information" for over 45 TSPs. *See* Pls.' Stmt., Ex. T, ECF No. 222-20 [hereinafter PEX T[3]]. The Plan identified each "Subcontractor['s]" name, address, telephone number, the total amount of work in dollars set aside for the subcontractor, and the percentage of the total set aside amount designated for each subcontractor. *See generally id.* The Plan also required the "prime contractor"—MTM—to make certain certifications in a notarized statement, including its efforts to ensure that various entities "will have an equitable opportunity to compete for subcontracts"; a promise that "the subcontractor will adopt a subcontracting plan similar to the subcontracting required by the contract"; and an assurance that

---

[3] The court refers to Plaintiffs' summary judgment exhibits by "PEX [x]" and utilizes Bates stamp pagination where available. For deposition testimony, the court cites to the deposition pagination. Otherwise, the court refers to the CM/ECF pagination. The exhibits are found at ECF Nos. 222 and 223.

"the prime contractor will cooperate . . . to allow the District to determine the extent of compliance by the prime contractor with the subcontracting plan." *Id.* at OCP000473.

### 1.    TSP Agreements

The Contracts, which are nearly 200-pages long, contain very specific requirements for TSPs, including vehicle specifications, driver qualifications, and requirements for driver conduct, among others.  MTM must ensure that TSPs follow certain requirements of the Contracts by including them in the service agreements between MTM and the TSPs ("TSP Agreements" or "Service Agreements").  2014 Contract ¶¶ C.3.1.4, C.3.2.2.1; 2015 Contract ¶¶ C.5.1.4, C.5.2.2.1. MTM has a standard Service Agreement that it executes with its TSPs.  *See* Pls.' Stmt. ¶ 6; *see also* Pls.' Mot. for Class Cert., ECF No. 130-2, Ex. 5, ECF No. 130-7 [hereinafter "CC Ex. 5[4]"], at MTM000913 (a copy of the standard agreement).  Their relationship is non-exclusive: MTM and the TSPs may "enter into Agreements with other entities or persons to provide the same or similar services."  CC Ex. 5 at MTM000927; *see also* Def.'s Stmt., Ex. 44, ECF No. 225-45 [hereinafter DEX 44[5]], ¶ 5; DEX 45, ECF No. 225-46, ¶ 5 (evidence presented by MTM that TSP drivers performed services for clients besides MTM).

### 2.    MTM's Implementation of the Contract

The Contracts impose substantial responsibilities on MTM to ensure that TSPs deliver safe and effective NEMT services to eligible District residents.  Because the various dimensions of

---

[4] Plaintiffs' Motion for Summary Judgment incorporates by reference the exhibits previously filed relating to their Motion for Class Certification, ECF No. 130.  *See, e.g.,* Pls.' Stmt. ¶ 1.  The court refers to the exhibits as "CC Ex. [x]" and utilizes Bates stamp pagination where available.  For deposition testimony, the court cites to the deposition pagination.  Otherwise, the court refers to the CM/ECF pagination.  The class certification exhibits are found at ECF Nos. 130, 131, 155, and 156.

[5] The court refers to MTM's exhibits presented in opposition to Plaintiffs' motion as "DEX [x]" and uses Bates stamp pagination where available.  For deposition testimony, the court cites to the deposition pagination.  Otherwise, the court refers to the CM/ECF pagination.  The exhibits are found at ECF No. 225.

those responsibilities are relevant to the certified questions, the court goes into some detail about the Contracts' requirements as they relate to TSPs and how MTM carries them out.

a.    Vehicle Requirements

MTM implements the Contracts' vehicle requirements in its Service Agreements. *See generally* 2014 Contract ¶ C.3.2.3.2.5; 2015 Contract ¶ C.5.2.3.2.5 (contractual vehicle requirements). The Service Agreements require that vehicles used to transport NEMT clients must be "clean, mechanically safe, and road-worthy," without "excessive vibration or noise that creates passenger discomfort." CC Ex. 5 at MTM0000934. They must be free of "[e]xcessive grime, rust, chipped paint or major dents" or "[d]irt, oil, grease or litter." *Id.* at MTM0000919; *see also* 2014 Contract ¶ C.3.2.3.2.5(w)–(x); 2015 Contract ¶ C.5.2.3.2.5(y)–(z). The Service Agreements also include specific requirements for vehicles used to transport wheelchairs. CC Ex. 5 at MTM000918; *see* 2014 Contract ¶ C.3.2.3.2.6; 2015 Contract ¶ C.5.2.3.2.6.

TSPs are contractually required to display certain information both on the inside and outside of vehicles. In the interior, "[a]ll vehicles must prominently display [the TSP's] name, and phone number," "signage displaying [MTM's name], address and phone number," a photo ID of the driver "on the side wall in clear view of passengers at all times," and signage to inform passengers of the "[n]o smoking, eating or drinking" policy, seatbelt requirement, and prohibition on audio devices. CC Ex. 5 at MTM000917, 931, 933; *see also* 2014 Contract ¶ C.3.2.3.2.5(z); 2015 Contract ¶ C.5.2.3.2.5(dd). On the exterior, "vehicles must be clearly marked" with the TSP's name, vehicle number, Washington Metropolitan Area Transit Commission certificate, and MTM's toll free telephone number with a "How's My Driving, call 1-800- . . ." notice on the rear of the vehicle. CC Ex. 5, at MTM000933; *see also* 2014 Contract ¶ C.3.2.3.2.5(y); 2015 Contract ¶ C.5.2.3.2.5(aa)–(cc).

The Contracts require MTM to put in place a system to oversee and monitor TSP compliance with the Service Agreements' terms regarding vehicles. MTM must "develop an internal inspection process and monitoring system to ensure that all Transportation Provider vehicles comply with the [Service Agreements] vehicle requirements." 2014 Contract ¶ C.3.2.3.2.8; 2015 Contract ¶ C.5.2.3.2.8. The District must approve the inspection process, which at a minimum requires (1) an initial inspection of each TSP vehicle prior to beginning services under the NEMT program; (2) annual inspections; and (3) vehicle-specific inspections as needed to respond to complaints or other inquiries. *See* 2014 Contract ¶ C.3.2.3.2.8; 2015 Contract ¶ C.5.2.3.2.8 (listing additional requirements). MTM's Service Agreements require that "daily pre-trip inspection reports" be conducted, documented, and maintained by TSPs. CC Ex. 5 at MTM000934. These daily inspections include assurances that the vehicle passed state inspection, received appropriate periodic maintenance on the manufacturer's recommended schedule and in accordance with federal and state safety and mechanical requirements, and that other equipment such as fire extinguishers and first-aid kits received appropriate maintenance. *Id.*

MTM has adopted a policy for inspecting and monitoring TSPs. The policy states that site visits to TSPs "will be conducted to review and discuss the requirements of the Transportation Provider Guidelines and complete Vehicle Inspections/virtual inspections of the [TSP's] fleet of vehicles." CC Ex. 51, ECF No. 131-9, at MTM000807. MTM conducts both annual vehicle inspections of all TSP vehicles used for its services and deploys staff to conduct random or "special and/or impromptu" inspections of TSP vehicles. *See* PEX M, ECF No. 223-11, at MTM003336. MTM staff uses a "vehicle inspection sheet" to perform these inspections, and "affix[es] a MTM inspection sticker on the window" of each vehicle receiving a passing grade. *Id.* If a vehicle fails inspection, TSPs must fix the infractions within a time frame designated by MTM, and MTM will

schedule a date to re-inspect the vehicle. *Id.* Any failing vehicle must be removed from use in the TSP's fleet and MTM's web "credentialing" system until it comes into compliance. *Id.*

The evidence suggests that MTM's inspections occur with varying frequency. *See, e.g.*, DEX 16, ECF No, 225-17, at 158:15–159:18 (Plaintiff Frye acknowledging with respect to vehicle inspections that: "you never really seen them;" "nobody really never checked them;" "I have seen them, but I never had [a] problem;" "[t]hey never really came up to my van and checked mine[]"); DEX 18, ECF No. 225-19, at 238:3-15 (Plaintiff Harris acknowledging that he had no direct dealings with anyone from MTM other than the upfront training he received from MTM after he left prior employment and became employed by Star Transportation); DEX 28, ECF No. 225-29, Response to Rog. No. 9 (Plaintiff Bianca Bowie stating that "I do not recall MTM inspecting my vehicle" and "I heard from other drivers that MTM performed vehicle inspections"); *see also* DEX 6, ECF No. 225-7, at 2; DEX 15, ECF No. 225-16, at 2; DEX 25, ECF No. 225-26, Response to Rogs. No. 8 & 9; DEX 32, ECF No. 225-33, Response to Rogs. No. 8 & 9; *but see* DEX 41, ECF No. 225-42, ¶ 6 (Plaintiff Tina Marie Edwards reporting that she "witnessed MTM field inspectors inspect and approve other drivers' vehicles many times").

b.    Driver Qualifications and Conduct

TSPs, not MTM, hire individual drivers. *See* Def.'s Stmt., Add'l Facts, ¶ 1(k) (additional fact undisputed by Plaintiff); *see generally* DEX 5–15, ECF Nos. 225-6–225-16 (declarations of named and opt-in plaintiffs describing their hiring organization as different TSPs); DEX 16–18, ECF Nos. 225-17–225-19 (depositions of named plaintiffs describing recruitment and hiring processes of TSPs). But to provide NEMT services under the Contracts, drivers must be "fully credentialed and approved by MTM." CC Ex. 5 at MTM000920; *see also* 2014 Contract ¶ C.3.2.3.3.1 (requiring MTM to ensure that drivers fulfill certain minimum requirements);

2015 Contract ¶ C.5.2.3.3.1.  TSPs supply MTM with all credentialing data regarding newly hired drivers by uploading the information to MTM's website for its approval.  *See* CC Ex. 69, ECF No. 131-19, at MTM000829–31.  The basic eligibility requirements include a driver's license, federal background check, drug screen, motor vehicle record, and certificates for defensive driving training, CPR training, and first aid training from a third party chosen by the TSP. *See* CC Ex. 5 at MTM000919–20; 2014 Contract ¶¶ C.3.2.3.3.1–C.3.2.3.3.4; 2015 Contract ¶¶ C.5.2.3.3.1–C.5.2.3.3.4; *see also* CC Ex. 7, ECF No. 131-8, at 73:18–88:13; CC Ex. 55, ECF No. 130-57, at 1.  Per the Service Agreements, TSPs may not use drivers convicted of certain crimes or offenses, such as child or domestic abuse, or alcohol related offenses within the last five years.  CC Ex. 5 at MTM000920.  TSPs also must conduct random drug screenings of all drivers on a quarterly basis "with copies of test results provided to MTM."  CC Ex. 5 at MTM000932; 2014 Contract ¶ C.3.2.3.3.4(d) (requiring MTM to ensure that "random drug screenings are conducted at a minimum quarterly with the results available for review by the" District); 2015 Contract ¶ C.5.2.3.3.4(d) (same).

MTM also carries out other driver requirements under the Contracts.  The standard Service Agreements between MTM and its TSPs require that drivers "maintain an acceptable standard of dress, personal grooming, and behavior in order to present a neat, clean, and professional appearance," and dictates that NEMT drivers must "wear authorized uniforms . . . worn in an approved manner including shirts worn tucked inside the pants with no other logos than those approved by MTM."  CC Ex. 5 at MTM000934; *see also* 2014 Contract ¶ C.3.2.3.3.4(f); 2015 Contract ¶¶ C.5.2.3.3.4(f), C.5.2.3.3.5(a).  TSPs are required to provide drivers with visible identification cards, which they must have when providing NEMT services.  CC Ex. 5 at MTM000917; 2014 Contract ¶ C.3.2.3.3.5(d); 2015 Contract ¶ C.5.2.3.3.5(e).  MTM's corporate

representative explained that the uniforms are the TSP's, not MTM's.  *See* CC Ex. 7 at 108:15–109:4; *see also* 2014 Contract ¶ C.3.2.3.3.5(d) (dictating "an official company I.D. badge"); 2015 Contract ¶ C.5.2.3.3.5(e) (same).

The Service Agreements proscribe certain driver conduct.  Drivers must "drive in a professional, safe and courteous manner."  CC Ex. 5 at MTM000917.  To that end, drivers may not engage in certain conduct while performing NEMT services, including: (1) drug or alcohol use; (2) leaving patients unattended; (3) entering patients' homes without prior authorization from MTM; (4) smoking, eating, or drinking in their vehicles or in the presence of patients, or allowing patients to smoke in TSP vehicles; or (5) using vehicles for personal reasons without specific authorization from MTM.  CC Ex. 5 at MTM000917–18, 934; *see also* 2014 Contract ¶ C.3.2.3.3.5 (a), (c), (e); 2015 Contract ¶ C.5.2.3.3.5(b), (d), (f).

The Service Agreements and MTM corporate policies include some affirmative steps that drivers must take while performing their duties.  Drivers must properly secure mobility devices before proceeding.   CC Ex. 5 at MTM000918, 934; *see* 2014 Contract ¶ C.3.2.3.3.5(*l*); 2015 Contract ¶ C.5.2.3.3.5(*l*).  Drivers must exit the vehicle to open and close the doors when passengers enter or exit, provide safe assistance to or from the main door or reception desk of the destination-facility, and must not depart until the passenger is safely inside the facility.  CC Ex. 5 at MTM000934; *see* 2014 Contract ¶ C.3.2.3.3.5(g), (m)–(n); 2015 Contract ¶ C.5.2.3.3.5(h), (n), (p).  Drivers must also identify and announce their presence during pickup.  CC Ex. 5 at MTM000934; 2014 Contract ¶ C.3.2.3.3.5(h); 2015 Contract ¶ C.5.2.3.3.5(i).  Drivers have to "allow a minimum of [15] minutes 'wait time'" for MTM's clients who are late for their pick-ups, ensure that trips do not take over an hour (except for long-distance trips), and complete all pre-scheduled trips "even under the circumstance when the medical service extends past the

approximate expected completion time." CC Ex. 5 at MTM000932; CC Ex. 69 at MTM000845;
*see* 2014 Contract ¶ C.3.2.3.4; 2015 Contract ¶ C.5.2.3.4.

Much like with vehicles, the Contracts state that MTM "shall develop" a District-approved "inspection process and monitoring system" to ensure drivers' compliance with various requirements. 2014 Contract ¶ C.3.2.3.3.6; 2015 Contract ¶ C.5.2.3.3.6. MTM must, at a minimum, ensure that: (1) all drivers' licenses remain current; (2) criminal background and traffic record checks are updated; (3) random drug screenings are completed on a quarterly basis; (4) first aid and CPR certifications remain current; and (5) drivers complete the necessary training and education. *Id.* MTM implemented a policy to conduct "[o]n-[s]treet [o]bservations" to "observe [TSPs], drivers and vehicles during the normal course of work." CC Ex. 51, ECF No. 131-9, at MTM000808; CC Ex. 60, ECF No. 131-16, at MTM000809. MTM inspectors monitor the drivers' "pick up and drop off activity, including timeliness [and] passenger assistance," check the drivers' "dress attire" and "identification and trip documentation," and document their findings on an MTM "On-Street Observation form." CC Ex. 60 at MTM000809.

Additionally, roughly half of the NEMT vehicles in the D.C. area are equipped with surveillance devices for the purposes of "impartial surveillance" related to "complaint resolution, incident and accident verification," "training," and "quality control." *See* CC Ex. 61, ECF No. 131-17, at MTM000881; *see also* PEX C, ECF No. 223-4, at 140:5–141:7 (deposition designations of MTM's corporate representative). MTM's corporate representative stated that cameras are used in vehicles that TSPs use to transport adult "DDS patients"—patients with cognitive disabilities. PEX C at 141:8-22. Surveillance video is stored only for a set length of time and "retrievable only by approved MTM staff in the event it might be needed to provide information about a given situation" or "reviewed randomly at MTM's discretion" for the

aforementioned purposes.  CC Ex. 61 at MTM000881.  Any problems found are reported to MTM corporate quality management and the District.  PEX C at 146:3-12.

c.    <u>Training</u>

Under the Contracts, MTM must ensure that drivers complete certain training and education requirements before providing services.  *See* 2014 Contract ¶ C.3.2.3.3.4(e); 2015 Contract ¶ C.5.2.3.3.4(e).  To that end, MTM developed a District-approved "training and education plan for" TSPs and their drivers.  2014 Contact ¶ C.3.2.5.1; 2015 Contract ¶ C.5.2.5.1.

Pursuant to the standard Service Agreements, TSPs agree "to develop and maintain a Driver Training Program" and retain attendant "training documentation."  CC Ex. 5 at MTM000919.  This Driver Training Program must include (1) defensive driving, (2) assisting passengers with disabilities, (3) emergency procedures, and (4) proper loading, unloading and tie-down procedures, if providing wheelchair services.  *Id.*; *see* 2014 Contract ¶¶ C.3.2.5.1.2, C.3.2.5.1.3(a); 2015 Contract ¶¶ C.5.2.5.1.2, C.5.2.5.1.3(a).  Prospective drivers also must successfully complete training on fraud, waste, and abuse and pass an exam following the training. CC Ex. 7 at 85:8-16.  MTM maintains certifications of completed trainings.  *See id.* at 83:15-20, 188:14-17; CC Ex. 59, ECF No. 130-61, at MTM003359–60 (MTM certifications for Named Plaintiff Franklin's DDS training); *see also* 2015 Contract ¶ C.3.2.5.1.6; 2014 Contract ¶ C.5.2.5.1.6.

Record evidence also suggests that MTM directly trains drivers to some extent. MTM itself operates a training department.  PEX C at 178:10–179:8. And as part of MTM's credentialing requirements, drivers must undergo "DDS training" by MTM, which instructs drivers on handling adults with cognitive disabilities.  *See* CC Ex. 55 at 1; *see also* 2014 Contract ¶ C.3.2.5.1.4 ("The Broker shall develop a training course for direct Transportation Providers that

12

deliver services to" patients "with a [d]evelopmental [d]isability," which TSPs must "attend and successfully complete"); 2015 Contract ¶ C.5.2.5.1.4 (same).  MTM conducts this training for drivers in person, and it includes nine different component parts covering topics ranging from sexual harassment to the Americans with Disabilities Act.  *See* CC Ex. 7 at 171:3-5, 186:9–187:11; CC Ex. 59 at MTM003359–60.  Drivers also undergo "annual refresher training" on these various topics.  PEX C at 171:12–172:6.

d. <u>Scheduling</u>

The Contracts make MTM responsible for assigning requested rides to TSPs.  Per the Contracts, MTM "shall schedule service for each authorized transportation request received" and "utilize scheduling software . . . to develop and maintain a systematic procedure to rotate or assign transportation requests in a fair, equitable, and cost effective manner."  2014 Contract ¶ C.3.3.3.6; 2015 Contract ¶ C.5.3.3.6.  MTM must notify the TSPs of an assignment at least two business days prior to the trip, if possible.  2015 Contract ¶ C.5.3.3.6.2.

MTM operates approximately 15 call centers that coordinate trip requests from Medicaid patients in the D.C. area.  PEX C at 94:9–95:3, 96:2-12.  TSPs cannot communicate with patients directly to schedule trips—all trip arrangements proceed through MTM.  *See* CC Ex. 69 at MTM000843.  MTM stores information on which trips are assigned to each TSP in its systems.  PEX Q, ECF No. 223-15, at 103:15–104:4.

TSPs receive trip requests generally in two ways.  First, MTM's call centers assign trip requests to individual TSPs based on the TSP's availability, location, and trip rates.  *See* PEX C at 96:2-19, 148:13–149:4; PEX Q at 90:5–91:12, 95:3-19.  Availability under the program is based on the number of vehicles in a TSP's fleet multiplied by each vehicle's capacity and reduced by a 50% assumption that TSPs are supplying rides for other transportation services.  *See* DEX 22,

13

ECF No. 225-23, at 81:3–85:12, 95:10-14.  Location is based on the geographic proximity of the TSP to the pickup location.  *Id.* at 95:3-9.  Costs are determined by an agreed-upon "rate sheet." *Id.* at 95:15-19; PEX C at 66:17–67:12; *see also* CC Ex. 63, ECF No. 131-18, at MTM000942 (example of rate sheet between MTM and a TSP).  MTM favors assigning trips to the TSP with the lowest trip rate, all else being equal.  *See* CC Ex. 2, ECF No. 131-4, at 97:16–98:1. Second, TSPs can pick up additional unassigned or returned trips in MTM's online "Marketplace" at their discretion.  *See* DEX 3, ECF No. 225-4, at 182:5-19.

Once a trip is assigned to a TSP, MTM communicates the details via its "Electronic Trip Download" site, phone, and/or fax.  CC Ex. 69 at MTM000834.  Drivers, in turn, receive work assignments from the TSPs themselves.  *See* DEX 23–27, ECF Nos. 225-24–225-28, Response to Rog. No. 3 (interrogatory responses of opt-in plaintiffs confirming that they received work assignments from TSPs, not MTM).  The ways in which TSPs communicated work assignments to drivers varied between phone calls, faxed schedules, in-person pickup, and text messages. *See, e.g., id.*  TSPs may decline assigned trips from MTM and retain the discretion to turn back any trips assigned to them more than 48 hours before scheduled pick-up without penalties.  DEX 3 at 92:12–94:4.  Trips turned back with less than 48 hours' notice are subject to a liquidated damages penalty by MTM.  *Id.* at 93:10-14.  Turning back trips happens with some frequency.  DEX 21, ECF No. 225-22, ¶¶ 6–7 (declaration of MTM corporate employee Christina Gunseor stating that two of the TSPs turned back over 10,000 trips and eight others turned back between 3,300 and 6,300 trips in a six-year period.)

Information from MTM's Electronic Trip Download web portal can be downloaded by TSPs into an Excel spreadsheet, or a "manifest."  *See* CC Ex. 69 at MTM000834.  Information can be organized in a variety of templates—the standard template includes columns for a patient's

Medicaid number, first and last name, age, and phone number; the trip date; the vehicle type; and trip status codes, which tell a TSP the status of the trip (*i.e.,* scheduled, cancelled, etc.). *Id.* at MTM000837. MTM also provides TSPs with a "Daily Trip Log." *See id.* at MTM000841–42; *see also* PEX R, ECF No. 223-16, at MTM003478 (example of daily log). The log includes columns for the MTM trip number, the patient's name, and the time of pickup and drop-off for each trip. *See* PEX R at MTM003478. Both drivers and patients must sign the daily trip log to confirm the veracity of the information included and to confirm the trip's completion. CC Ex. 69 at MTM000841.

Other aspects of drivers' schedules, such as time-off, are controlled directly by the TSPs. *See* Def.'s Stmt., Add'l Facts, ¶ 1(r) (undisputed that TSPs control time-off). Additionally, the TSPs determine how to construct drivers' work schedules—some companies set a weekly schedule, some set a daily schedule, and at least one had a fixed schedule and route. *Id.* ¶ 1(t) (undisputed with regards to this statement). These schedules were communicated to drivers in different ways. *Id.* ¶ 1(u) (undisputed with regards to this statement); *see also id.* ¶ 1(v) (discussing undisputed testimony of opt-in Plaintiff Derrick Ford, who described differences in receiving his schedule while working at two different TSPs).

e.    Payment

The District pays MTM monthly using a "capitated" rate. *See* 2014 Contract ¶ G.2.1; 2015 Contract ¶ G.4.1. That is, the District estimates all Medicaid recipients eligible for NEMT services and multiplies the number of recipients by the contractually set rates to produce the final payment. 2014 Contract ¶¶ C.1.2.8, C.2.1, G.2.1; 2015 Contract ¶¶ C.3.9, C.4.1, G.4.1. MTM then pays the TSPs in accordance with the terms of their Service Agreements from these capitation payments. 2014 Contract ¶ G.3.3, 2015 Contract ¶ G.4.2.3. MTM must validate that

all transportation services are "properly authorized and actually rendered" when issuing payment to TSPs.  2014 Contract ¶ G.3.3(a); 2015 Contract ¶ G.4.2.3(a).

MTM generally has standard rates for each TSP on NEMT trips.  *See* PEX C at 66:17–67:12; DEX 3 at 34:9-18; CC Ex. 63 at MTM000942 (example of rate sheet).  These are negotiated by each TSP and vary among TSPs.  *See* PEX C at 66:19–67:5; *see also* Def.'s Stmt., Add'l Facts, ¶ 1(bb) (undisputed that trip rates vary between TSPs).  TSPs may request increases for these rates—MTM will determine whether to grant them on a variety of factors such as performance, vehicle capacity, and how many trips that transportation provider may be able to accommodate. PEX Q at 44:3-18.  But by completing a trip at the agreed-upon set rate, TSPs "waive[] any claim for compensation in excess" of that rate.  CC Ex. 69 at MTM000843.  To be paid for a trip by MTM, TSPs must upload signed Daily Trip Logs that MTM provides to TSPs and drivers.  *See id.* at MTM000819, 851–64.  MTM can deny a TSP's payment request if information on these Daily Trip Logs is missing.  *Id.* at MTM000841.

As Plaintiffs admit, MTM does not set individual drivers' wages.  *See* Pls.' Mot., Mem. of P&A in Supp., ECF No. 222 [hereinafter Pls.' Mem.], at 9.  Indeed, drivers reported being paid different wage rates and with different pay frequencies across different TSPs.  Def.'s Stmt., Add'l Facts, ¶ 1(y) (undisputed as to this statement); *see also Harris v. Med. Transportation Mgmt., Inc.*, No. 17-cv-01371 (APM), 2020 WL 5702085, at *9 (D.D.C. Sept. 24, 2020) ["*Harris II*"] (noting that "[v]ariations are particularly striking as to putative class members' pay" and describing the differences).

f.   Recordkeeping

MTM maintains certain driver records.  These include: background checks, drug screenings, driving records and license information, and CPR and first-aid training certifications,

which are uploaded to MTM during the initial credentialing period.  DEX 3 at 77:3–88:13; *see also* 2014 Contract ¶ C.3.2.3.3.4; 2015 Contract ¶ C.5.2.3.3.4.  MTM requires TSPs to retain copies of the drivers' daily logs.  Pls.' Stmt. ¶ 96 (undisputed); *see* 2014 Contract ¶ C.3.2.3.10.4; 2015 Contract ¶ C.5.2.3.10.4.  MTM must also obtain the daily logs, accident and incident reports, inspection reports, and complaint logs from the TSPs.  *See* 2014 Contract ¶ C.3.2.3.10.3; 2015 Contract ¶ C.5.2.3.10.3.

### g.    Complaints and Grievances

The Contracts require MTM to "record and respond to all complaints received related to the [NEMT] services" and to develop formal grievance policies and procedures, which are available to TSPs.  2014 Contract ¶¶ C.3.3.3.8.1, C.3.3.3.8.5; 2015 Contract ¶¶ C.5.3.3.8.1, C.5.3.3.8.5.  MTM in turn maintains a "mechanism and reporting system for all complaints" related to NEMT services.  PEX N, ECF No. 223-12, at MTM000866.  This includes complaints made by patients against TSPs and NEMT drivers.  *See id.*; PEX C at 70:21–72:6.  MTM also provides "an infrastructure" for appealing written resolutions of grievances and complaints, and is available to passengers, TSPs, and the District for their use.  *See* PEX P, ECF No. 223-14, at MTM 000871–74; *see also* 2014 Contract ¶¶ C.3.3.3.8.3, C.3.3.3.8.5(i); 2015 Contract ¶¶ C.5.3.3.8.3, C.5.3.3.8.5(i).  MTM also has developed a "process for handling, documenting and reporting information relating to" vehicle accidents and other incidents.  *See* PEX O, ECF No. 223-13, at MTM000868.  Drivers must report any accident or incident directly to MTM using an MTM form.  CC Ex. 57, ECF No. 131-14, at MTM000418, 422–23.

### h.    Termination

MTM cannot fully terminate drivers from employment with their TSPs.  *See* Def.'s Stmt., Add'l Facts, ¶ (1)m (admitted as to this statement).  As Plaintiff Frye testified, drivers may continue

employment with the TSP and drive for other contracts outside of the NEMT program.  DEX 16 at 33:2–35:8 (description by Plaintiff Frye of his continued employment with his TSP after having been disqualified from Medicaid NEMT trips due to a criminal conviction).  But per the Service Agreements, MTM "[r]eserves the right to disapprove or suspend any driver" from participation in the NEMT program "for safety reasons; or where disqualification of a driver . . . is requested by" the District; "or for other reasons of good cause within MTM's sole discretion."  CC Ex. 5, at MTM 000913, 920.  Drivers who refuse to submit to drug or alcohol screenings or who test positive on such screenings may not participate in NEMT services.  *Id* at MTM000919–20.; *see also* 2014 Contract ¶¶ C.3.2.3.3.4(d), C.3.2.3.3.5(s); 2015 Contract ¶¶ C.5.2.3.3.4(d), C.5.2.3.3.5(v). MTM's corporate representative testified at her deposition that in practice MTM notifies the District of any infraction and allows it to give the directive of suspension.  *E.g.,* CC Ex. 7 at 127:1–14.

### B.    Procedural Background

Plaintiffs filed this putative class action and FLSA collective action against MTM in July 2017, asserting five claims.  *See generally* Compl., ECF No. 1.  Relevant here are four alleged violations of federal and D.C. wage statutes: (1) the FLSA, 29 U.S.C. § 201 *et seq.*; (2) the D.C. Minimum Wage Act, D.C. Code § 32–1001 *et seq.*; (3) the D.C. Living Wage Act, D.C. Code § 2–220.01 *et seq.*; and (4) the D.C. Wage Payment and Collection Law, D.C. Code § 32–1301 *et seq.*  This court denied MTM's motion to dismiss these claims.  *See Harris v. Med. Transp. Mgmt., Inc.*, 300 F. Supp. 3d 234 (D.D.C. 2018) ["*Harris I*"].  Thereafter, the court denied Plaintiffs' motion for class certification under Rule 23(b)(3), finding that they had failed to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *See Harris II*, 2020 WL 5702085, at *1 (internal quotation marks and

citation omitted). The court also denied Plaintiffs' request for certification of an issue class under Rule 23(c)(4) without prejudice, finding that the request was not sufficiently briefed. *See id.*

In August 2021, and following supplemental briefing, the court issued an opinion certifying an issue class under Rule 23(c)(4) on two questions: (1) whether MTM is a joint employer for purposes of the FLSA and D.C. wage laws and (2) whether MTM is a general contractor to the TSPs for purposes of D.C. wage laws. *See Harris v. Med. Transp. Mgmt., Inc.*, No. 17-cv-01371 (APM), 2021 WL 3472381, at *1 (D.D.C. Aug. 6, 2021) ["*Harris III*"]. MTM appealed that decision. While the case was pending before the D.C. Circuit, Plaintiffs moved for summary judgment on the two issues certified for class-wide resolution.

In July 2023, the D.C. Circuit held that the court had not considered certain required elements under Rule 23(a) and (b) in certifying the issue class and remanded the case for further consideration. *See Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 752 (D.C. Cir. 2023). After another round of supplemental briefing, the court recertified an issue class regarding the joint employer and general contractor questions. *See* Mem. Op. & Order, ECF No. 240 [hereinafter "*Harris IV*"], at 18. The issue class consists of "[d]rivers who provided non-emergency medical transportation services in the District of Columbia under any contract between the District of Columbia and MTM at any time from three years prior to the filing of this action, or July 13, 2014, through the date on which notice is issued affording the right to opt out of the class." *See* Order Amending Class Cert. Order, ECF No. 245. The class notice issued on March 15, 2024. *See* Pls.' Notice of Issued Class Notice, ECF No. 248.

With the issue class certified and the class notice issued, the court now considers Plaintiffs' motion for summary judgment, which asserts that MTM is both a joint employer of NEMT drivers and a general contractor to the TSPs.

### III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. Dist. of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015) (citations omitted). "[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Durant v. D.C. Gov't*, 875 F.3d 685, 696 (D.C. Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"—its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that "a reasonable jury [could] find in its favor." *Elzeneiny*, 125 F. Supp. 3d at 28 (citing Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Laningham v. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987)).

### IV.    DISCUSSION

Having conducted an exhaustive review of the record, the court concludes as follows. Plaintiffs have not established that MTM is a "joint employer" for purposes of the FLSA and

D.C. wage laws.[6]  They have, however, shown that MTM is a general contractor and that TSPs are subcontractors under D.C. law.

### A.    Joint Employment

The court begins with the first certified issue: "whether MTM qualifies as a joint employer of the putative class members" for purposes of the FLSA and the D.C. wage statutes.  As the court noted in *Harris I*, there is no claim in this case that any Plaintiff was employed directly by MTM.  *See Harris I*, 300 F. Supp. 3d at 236.  Instead, Plaintiffs' primary theory of liability rests on the ground that MTM is a "joint employer" of the NEMT drivers and therefore equally responsible for making legally compliant wage payments.

For liability to attach under the FLSA, there must be an employer-employee relationship.  *See* 29 U.S.C. § 206(a).  The FLSA defines "employer" expansively, including "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id.* § 203(d); *Falk v. Brennan*, 414 U.S. 190, 195 (1973) (discussing the "expansiveness of the [FLSA]'s definition of 'employer'").  An entity "[e]mploy[s]" an individual if it "suffer[s] or permit[s]" the individual to work.  29 U.S.C. § 203(g).  The FLSA's broad definitions protect "many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category."  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (internal quotation marks and citation omitted); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (observing that the FLSA's "striking breadth . . . stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles").

---

[6] MTM seemingly makes a one-off request that the court grant summary judgment in its favor pursuant to Rule 56(f).  *See* Def.'s Opp'n at 60.  The court declines to do so.  Should MTM wish to have judgment entered in its favor, it must bring its own motion.

D.C. wage laws similarly define "employ" broadly. *See* D.C. Code § 32-1002(1A) (defining "employ" as "includ[ing] to suffer or permit to work" under the D.C. Minimum Wage Act); *id.* § 32-1301(2) (defining "[e]mployee" to "include any person suffered or permitted to work by an employer" under the D.C. Wage Collection and Payment Law). Courts have interpreted these definitions coextensively with the FLSA's. *See Steinke v. P5 Sols., Inc.*, 282 A.3d 1076, 1084–85 (D.C. 2022); *Wilson v. Hunam Inn., Inc.*, 126 F. Supp. 3d 1, 5–6 (D.D.C. 2015); *Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011).

The "'suffer or permit to work' language . . . require[s] courts to examine the 'economic reality' of an employment relationship rather than rest on 'technical concepts' such as the labels the parties attach to their relationship." *Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 394 (D.C. Cir. 2024) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). To that end, the "joint employment" doctrine recognizes that "an employee could have multiple employers for a single set of hours worked." *New York v. Scalia*, 490 F. Supp. 3d 748, 759 (S.D.N.Y. 2020) (citing *Falk*, 414 U.S. at 195). In cases where two entities are found to be joint employers, they will be held jointly and severally liable for any wage infractions under the FLSA. *See id.* at 757.

### 1.    *The Proper Test for Joint Employment*

As described in *Harris I*, determining whether two entities are joint employers is no small feat. *See Harris I*, 300 F. Supp. 3d at 241–43 (chronicling the "dizzying world of multi-factor tests that attempt to distill the concept of 'joint employment'" in circuit courts across the country). The parties have each asked the court to apply different tests from different circuits.

Plaintiffs urge the court to follow the framework set forth by the Fourth Circuit in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017). *See* Pls.' Mem. at 14–17. The *Salinas*

court held that "joint employment exists when (1) two or more persons or entities share, agree to allocate responsibility for, or otherwise codetermine—formally or informally, directly or indirectly—the essential terms and conditions of a worker's employment and (2) the two entities' combined influence over the essential terms and conditions of the worker's employment render the worker an employee as opposed to an independent contractor." *Salinas*, 848 F.3d at 129–30. To that end, the *Salinas* court identified six non-exhaustive factors that speak to the threshold question of "whether a purported joint employer shares or codetermines the essential terms and conditions of a worker's employment." *Id.* at 142. They are: (1) "[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means"; (2) "[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment"; (3) "[t]he degree of permanency and duration of the relationship between the putative joint employers"; (4) "[w]hether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer"; (5) "[w]hether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another"; and (6) "[w]hether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibilities over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work." *Id.* at 141–42.

Defendants, on the other hand, urge the court to follow the principles expressed by the D.C. Circuit in *Morrison v. International Programs Consortium, Inc.*, 253 F.3d 5 (D.C. Cir. 2011).[7] *See* Def.'s Opp'n at 12–13. *Morrison* was a case about whether a person claiming to be a "consultant" is in fact an "employee" for purposes of the FLSA. That determination, the court said, depended on the "economic reality" of the relationship. *See Morrison*, 253 F.3d at 10–11. Accordingly, it identified four "typical employer prerogatives" for consideration: (1) the power to hire and fire employees; (2) the ability to supervise and control employees' work schedules or conditions of employment; (3) the authority to determine the rate and method of payment; and (4) the maintenance of employment records. *Id.* at 11 (citation omitted).

Since summary judgment briefing closed, the D.C. Circuit has provided greater clarity on the proper joint-employment inquiry. In *Mills v. Anadolu Agency NA, Inc.*, the plaintiff brought wage claims against her former employer, as Plaintiffs do here, under the D.C. Wage Payment and Collection Law. *See* 105 F.4th at 394–95. The defendant insisted that Mills never directly worked for it, but rather had a fixed-term consultancy agreement with its foreign-based parent company. *Id.* at 398. The plaintiff, on the other hand, argued that, regardless of who formally had retained her, the defendant was her joint employer and therefore liable for wage violations under D.C. law. *Id.* at 397. Accordingly, the D.C. Circuit had to grapple with the proper test for determining joint employment.

To do so, the court looked to the principles underlying the FLSA. *See id.* at 393–94, 398–400. The court observed that "[t]he joint-employment inquiry, like the *Morrison* analysis

---

[7] Defendant also points to the D.C. Circuit's decision in *Browning-Ferris Indus. of Calif., Inc. v. NLRB*, 911 F.3d 1195 (D.C. Cir. 2018), as "binding precedent" in this matter. Def.'s Opp'n at 41–42. However, *Browning-Ferris* arose under the National Labor Relations Act and held that the test for joint-employer status is determined by application of traditional common-law agency principles. *See Browning-Ferris*, 911 F.3d at 1209. As discussed, the FLSA and D.C. wage statutes' concept of employment goes beyond common law agency principles and thus *Browning-Ferris* does not govern. *See, e.g., Darden*, 503 U.S. at 326.

regarding whether a worker is an independent contractor or an employee, centers on economic realities." *Id.* at 398. That said, "[w]hereas *Morrison* focuses on the relationship between worker and putative employer, the joint-employment inquiry probes the 'relationship between the employer who uses and benefits from the services of workers and the party that hires or assigns the workers to that employer.'" *Id.* at 398–99 (quoting *Salinas*, 848 F.3d at 137). The D.C. Circuit essentially lent its imprimatur to the Fourth Circuit's decision in *Salinas*, citing it for the proposition that courts "look to factors that bear on the degree to which putative joint employers share control over typical employer prerogatives." *Id.* at 399 (citing *Salinas*, 848 F.3d at 141). "Control that is shared by two entities acting jointly might manifest an employment relationship even if such a relationship were not evident based on the degree of control exerted by one of the entities alone." *Id.* (citing *Salinas*, 848 F.3d at 134).

The Circuit did not wholesale adopt *Salinas*' six factors, but it did focus on some of them. First, the court discussed how the putative joint employers controlled the way the plaintiff went about her work, by "provid[ing] workspace and equipment," "supervis[ing]" her through an on-site manager and setting the "work schedule and the workplace rules that [she] had to follow." *Id.* at 399. Second, the court looked to whether the putative joint employers shared hiring and firing authority. *Id.* Third, it considered which putative joint employer paid the plaintiff and gave her leave benefits. *Id.* And fourth, given that the putative joint employers had a parent-subsidiary relationship, the court emphasized that whether "one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer" may play a role. *Id.* (internal quotation marks and citation omitted). But the D.C. Circuit stressed "that the economic-reality test[] for . . . identifying a joint-employment relationship [is a] fact-intensive inquiry" and

that "access to discovery and the development of a factual record can affect the analysis of the parties' relationships " *Id.* at 399–400 (citation omitted).

This court therefore must follow the D.C. Circuit's lead in looking to the Fourth Circuit's *Salinas* decision for guidance as to the factors that are relevant to the joint-employer inquiry.[8]  The "fundamental threshold question that must be resolved in every joint employment case" is "whether a purported joint employer shares or codetermines the essential terms and conditions of a worker's employment."  *Salinas*, 848 F.3d at 142.

        *2.*     *Quality Control*

Before turning to the *Salinas* factors, this case presents an added wrinkle: MTM operates in a highly regulated industry in which many of the terms of its relationship with TSPs, and by extension the drivers, are a function of contractual requirements placed upon it by the District. *Salinas* noted that "an entity does not become a joint employer by engaging in oversight necessary to ensure that a contractor's services meet contractual standards of quality and timeliness." *Salinas*, 848 F.3d at 148 (citation omitted).  Other courts similarly have observed that "[e]xercising quality control by having strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions."  *Godlewska v. HDA*, 916 F. Supp. 2d 246, 259–260 (E.D.N.Y. 2013) (citing cases).  "This is especially true where the quality control's purpose is to ensure compliance with the law or protect clients' safety."  *Id.* (citing cases). The question ultimately is one of degree: do the quality control measures constitute "double checking to verify that the task was done properly" in accordance with legal requirements, or does it indicate that the joint employer is responsible for the "day-to-day management" of employees?

---

[8] MTM argues that *Salinas* improperly based its joint-employment approach on language in an interpretative rule issued by the Department of Labor in 1958.  *See* Def.'s Opp'n. at 42 (citing 29 C.F.R. § 791.2(a)); *see also Salinas*, 848 F.3d at 133–34 (citing the same).  The court need not entertain that argument in light of the D.C. Circuit's approval of the *Salinas* approach to identifying joint employment.

*McCoy v. Transdev Servs., Inc.* No. 19-cv-2137-DKC, 2022 WL 951996, at 10–11 (D. Md. Mar. 30, 2022) (internal quotation marks and citation omitted).

*Godlewska v. HDA* is illustrative.  Plaintiffs in that case were home health attendants employed by a non-profit agency, HDA, that contracted with New York City government entities to provide home attendant services to residents eligible for "personal care service," or "PCS." 916 F. Supp. 2d at 250.  The health attendants alleged that the City entities were joint employers under the FLSA.  *Id.* at 250–51.  State regulations governed "in detail the terms, delivery, and administration" of the PCS program and delegated that program to City entities, who then used a form contract for its agreement with HDA.  *See id.* at 251–52.  The regulations dictated specific minimum qualifications for home attendants who provided PCS, including background checks, conduct requirements, and initial and periodic training.  *Id.* at 252.  HDA itself recruited and hired the individual attendants.  *Id.*  It also issued the plaintiffs' paychecks and set their pay rates.  *Id.* at 255–56.  The City entities approved PCS for individual patients and sent authorizations to HDA, who then scheduled a home attendant to visit the patient.  *Id.* at 252–53.  Pursuant to regulations and its contract, HDA generally supervised its attendants' performance, but the City entities oversaw and audited that supervision and received complaints from individual patients directly. *Id.* at 253–55.

The *Godlewska* court found that the City entities did "not control or supervise plaintiff's working conditions" and did "not manage plaintiffs on a day-to-day basis."  *Id.* at 260.  Instead, they "monitor[ed] HDA's compliance with the law and ensure[d] that HDA deliver[ed] quality services to patients."  *Id.* at 261–62.  The City entities thus were not joint employers because their actions "stem[med] entirely from the nature of the business of providing heavily regulated, government-funded health services to patients in their homes."  *Id.* at 261 (internal quotation marks

and alterations omitted); *see also Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 691–92 (D. Md. 2010) ("Quality control procedures ultimately stem[ming] from the nature of their business and the need to provide reliable services to their customers" are "qualitatively different from the control exercised by employers over employees."); *Zampos v. W&E Comms., Inc.*, 970 F. Supp. 2d 794, 804 (N.D. Ill. 2013) (similar).

With these cases and principles in mind, the court addresses the relevant factors as they apply to MTM's relationship with the District's NEMT drivers.

       3.    *Application*

       a.    <u>Shared Power to Direct, Control, or Supervise the Drivers</u>

The first *Salinas* factor looks to "[w]hether formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control or supervise the worker, whether by direct or indirect means." *Salinas*, 848 F.3d at 141. This factor favors MTM.

The record establishes that drivers do not report to MTM on a day-to-day basis. Nor do they hold themselves out as MTM employees. *See id.* at 147; *see* DEX 3 at 108:15–109:1 (testimony of MTM corporate representative that uniforms identified drivers as employed by the TSP); DEX 16 at 86:1-5 ("[F]irst . . . you call the people. You explain who you [are]. I am Darnell Frey. I work for Star Transportation . . . I am going to pick you up at a certain . . . time."). To the extent that they interact with people at MTM, it is largely in the context of District-mandated training sessions and safety inspections. *See* Sections II(A)(2)(a), (c), *supra*.

Individual drivers do not play a role in MTM's trip assignment decision—that determination is solely based on cost, availability, and location. *See* PEX C at 148:13–149:4; PEX Q at 90:5–91:12, 95:3-19 (testimony of MTM's corporate representative that "[t]he trips are assigned to the transportation provider based on the criteria[] we have already discussed, so it has

nothing to do with the drivers").  TSPs have the discretion whether to accept an assignment from MTM.  DEX 3 at 92:12–94:4; DEX 21 ¶ 3.  When they do, the TSP makes the trip assignment to the individual driver, and it is responsible for their drivers' schedules.  Pls.' Reply in Supp. of Pls.' Mot., ECF No. 227-2 [hereinafter Pls.' Reply], Pls.' Response to Def.'s Stmt. of Add'l Material Facts, ECF No. 227-3 [hereinafter Pls.' Response], ¶ q; *see also* DEX 23–27, Response to Rog. No. 3 (testimony of opt-in Plaintiffs about receiving their schedules for trips from their TSPs). To be sure, MTM provides the tools to review the trips assigned and to accept and create schedules for the drivers, *see* CC Ex. 69 at MTM000834–41, but, again, TSPs ultimately decide to whom a trip is given.  There is no evidence that MTM dictates how many hours each driver works, requires drivers to work additional hours, provides TSPs instructions over specific staffing of individual assignments, or instructs TSPs regarding overtime payments.  *See Salinas*, 848 F.3d at 145–46.

Plaintiffs nevertheless argue that this factor weighs in favor of finding a joint-employment relationship because MTM (1) "has a key role in training the drivers;" (2) "sets detailed rules for how drivers perform their duties"; (3) "prohibits certain conduct by the drivers;" (4) "requires random drug testing of drivers on a quarterly basis"; (5) dictates the procedures the drivers must follow to report accidents; (6) sets requirements on the timeliness of trips; (7) closely regulates the vehicles drivers use on their trips; (8) conducts inspections of the vehicles and the drivers; and (9) solicits feedback on the drivers' performance from riders and  supervises driver conduct through its complaint and grievance system.  Pls.' Mem. at 18–19.  MTM responds that these features of the relationship are akin to "quality control" and are "part of MTM's contractual obligation to monitor and enforce compliance with the District-mandated quality standards" and thus weigh against a joint employment determination.  Def.'s Opp'n at 28; *see generally* Def.'s Stmt.

The court agrees with MTM.  The detailed and comprehensive controls that Plaintiffs rely upon largely "stem from," *Godlewska*, 916 F. Supp. 2d at 260, the obligations placed upon MTM by its Contracts with the District.

That includes driver conduct and appearance requirements.  *See* 2015 Contract ¶ C.5.2.3.3.5(a) (MTM must ensure that Drivers are "neat and clear in appearance"); 2014 Contract ¶¶ C.3.2.3.3.4(f), C.3.2.3.3.5(d), (i); 2015 Contract ¶¶ C.5.2.3.3.4(f), C.5.2.3.3.5(e), (j) (uniform and identification requirements); 2014 Contract ¶¶ C.3.2.3.3.3, C.3.2.3.3.4(d), C.3.2.3.3.5(s); 2015 Contract ¶¶ C.5.2.3.3.3, C.5.2.3.3.4(d), C.5.2.3.3.5(v) (District's prohibitions on drug and alcohol use by drivers and requiring quarterly drug tests which may be made available for review by the District); 2014 Contract ¶ C.3.2.3.3.5(e); 2015 Contract ¶ C.5.2.3.3.5(f) (eating and smoking prohibitions); 2014 Contract ¶ C.3.2.3.4(a); 2015 Contract ¶ C.5.2.3.4(a) (requiring MTM to ensure that drivers wait up to 15 minutes for late passengers); 2014 Contract ¶ C.3.2.3.4(d), (f); 2015 Contract ¶ C.5.2.3.4(d), (f) (requiring MTM to ensure that drivers transport passengers on time for appointments).

The same is true of vehicle requirements.  *See generally* 2014 Contract ¶¶ C.3.2.3.2.5–C.3.2.3.2.6; 2015 Contract ¶¶ C.5.2.3.2.5–C.5.2.3.2.6 (detailed vehicle requirements for regular vehicles and wheelchair vans); 2014 Contract ¶¶ C.3.4.8.10–C.3.4.8.10.1; 2015 Contract ¶¶ C.5.4.8.10–C.5.4.8.10.1 (requiring MTM to maintain accident reports and stating that MTM must notify the District of any accidents occurring within two business days); 2014 Contract ¶ C.3.2.3.2.5(y); 2015 Contract ¶ C.5.2.3.2.5(aa) (requiring vehicles to have a "How's My Driving" sticker associated with MTM's number); 2014 Contract ¶ C.3.3.3.8; 2015 Contract ¶ C.5.3.3.8 (detailed complaint and grievance requirements); 2014 Contract ¶¶ C.3.2.3.2.8,

C.3.2.3.3.6; 2015 Contract ¶¶ C.5.2.3.2.8, C.5.2.3.3.6 (MTM must develop internal inspection and monitoring system for drivers and vehicles).

The Contracts also mandate that MTM "establish and implement Driver . . . training," which the District must approve.  2014 Contract ¶ C.3.2.5.1.3; 2015 Contract ¶ C.5.2.5.1.3.  This includes things such as: "defensive [d]riving training," "[f]irst aid and CPR training," "[d]river reporting requirements," and "[e]mergency and accident procedures."  *Id.*  And the Contracts require DDS training "develop[ed]" by MTM.  2014 Contract ¶ C.3.2.5.1.4; 2015 Contract ¶ C.5.2.5.1.4.

Plaintiffs' response is that, although the Contracts set out basic requirements, they are silent about the measures MTM must take to ensure the requirements are met and thus MTM exercises discretion in implementing terms, which favors a finding of joint employment.  *See* Pls.' Reply at 7–8.  Maybe so, but that does not defeat the fundamental point that, to the extent MTM controls drivers, it is through the *District*'s contractual requirements, not its own.  This is precisely the type of "quality control" function that courts have held does not establish a joint employer relationship.  *See Godlewska*, 916 F. Supp. 2d at 260–61 (citing cases).

b.      Shared Power to Hire, Fire, or Modify the
Terms and Conditions of the Drivers' Employment

The second *Salinas* factor—the degree to which putative employers share responsibility for hiring, firing, or modifying terms and conditions of employment—favors MTM, as well. Plaintiffs admit that "the drivers are hired and directly employed by the TSPs."  Pls.' Mem. at 20. Plaintiff Frye explained that he was recruited directly by the owner of his TSP.  DEX 16 at 62:10–63:5.  Plaintiffs Franklin and Harris both testified about their application and interview process with TSPs directly.  DEX 17, ECF No. 225-18, at 63:3–64:9; DEX 18 at 54:1–55:15, 161:10-22; *see generally* DEX 5–15 (declarations of opt-in Plaintiffs describing applying to and interviewing

with TSPs directly).  There is no record evidence that MTM reviews applications, is involved in interviews, or has any input into employment agreements between drivers and their TSPs.  These facts cut against a finding of joint employment.  *Cf. McCoy*, 2022 WL 951996, at *8 (holding that this factor favors joint employment where putative joint employer set aside driver applications and forwarded them to the direct employer).

Plaintiffs assert that MTM has "deep involvement in recruitment and hiring," Pls.' Reply at 16, because MTM requires certain qualifications and credentials before drivers can participate in the NEMT program, *see* Pls.' Mem. at 20.  But this is not the same as shared control over the power to hire.  Plaintiffs' own cases make the point.  *See id.* at 23–24 (citing *Schmidt v. DIRECTV, LLC*, No. 14-1300, 2017 WL 3575849 (D. Minn. Aug. 17, 2017) and *Perez v. Lantern Light Corp.*, No. C12-1406, 2015 WL 3451268 (W.D. Wash. May 29, 2015)).  In both cases, the putative joint employer enforced specific eligibility and certification requirements, including background checks, *before* any hiring by the direct employer.  *See Schmidt*, 2017 WL 3575849, at *4; *Perez*, 2015 WL 3451268, at *6.  Here, MTM's requirements kick in only if the driver wishes to participate in the NEMT program—eligibility requirements for direct employment with TSPs are not mandated by MTM.  Furthermore, to the extent that there are minimum qualifications for drivers, those are imposed by the District through its contract with MTM, not of MTM's own making.  *See* Section II(A)(2)(b), *supra*.

Nor does MTM have the power to fully terminate drivers.  *See* Pls.' Response ¶ m (admission from Plaintiffs that "MTM cannot terminate drivers from all employment with their TSPs").  Plaintiffs argue that MTM's contractual right to remove drivers from the NEMT program for various reasons, including those within its "sole discretion," evinces shared power to fire or modify the terms and conditions of their employment.  CC Ex. 5 at MTM000920.  But MTM's

authority as to firing extends no further than NEMT services performed by a driver. MTM has no say in whether the driver continues to work for the TSP on other contracts. *Cf. Mills*, 105 F.4th at 399 (shared authority where termination was effected by one joint employer even though the plaintiff was hired by the other). Further, according to MTM, as a matter of practice, it informs the District about circumstances that might warrant driver discipline and allows the District to make that decision. *See* CC Ex. 7 at 127:1-14; *cf. McCoy*, 2022 WL 951996, at *8 (putative joint employer emailed subcontractor and demanded termination; employee was subsequently terminated); *Young v. Act Fast Delivery of W. Va., Inc.*, No. 5:16-cv-09788, 2018 WL 279996, at *7 (S.D.W. Va. Jan. 3, 2018) (putative joint employer expressed desire to have drivers terminated directly). MTM's limited authority to terminate drivers from providing NEMT services is thus more consistent with its general role in controlling the quality of services, rather than as a joint employer. *See, e.g., Godlewska*, 916 F. Supp. 2d at 258; *Zampos*, 970 F. Supp. 2d at 803; *Jean-Louis v. Metro. Cable Comms., Inc.*, 838 F. Supp. 2d 111, 124 (S.D.N.Y. 2011); *Sigui v. M+M Comms., Inc.*, 310 F. Supp. 3d 313, 330–31 (D.R.I. 2018).

Plaintiffs argue that because MTM can suspend a driver from performing NEMT services this is the "functional equivalent of firing the driver" because some TSPs work only for MTM. Pls.' Mem. at 20; *see also* Pls.' Stmt. ¶¶ 30–34; *cf. Perez*, 2015 WL 3451268, at *6 (where workers performed all work for alleged joint employer pursuant to an exclusive contract between the labor contractor and alleged joint employer, removal from the joint employer was equivalent to firing). But Plaintiffs provide no evidence of this ever actually occurring. There is evidence of the converse, however. Plaintiff Frye continued driving with his TSP even after he was disqualified from the NEMT program. *See* DEX 16 at 33:2–35:8.

c.    The Degree of Permanency and Duration of
the Relationship Between MTM and the TSPs

This third *Salinas* factor—the permanency and duration of the MTM-TSP relationship—also weighs against joint employment. The Service Agreements do not bear hallmarks of permanence. True, MTM must enter into agreements with TSPs to perform transportation services, *see* 2014 Contract ¶¶ C.1(a), C.3.1.5; 2015 Contract ¶¶ C.1(a), C.5.1.5, but the contracts are terminable. For one, the District has a say in whether a TSP can perform NEMT services. *See* 2014 Contract ¶ C.3.1.9(a); 2015 Contract ¶ C.5.1.11(a). Also, the standard Service Agreements provide for a one-year relationship between MTM and a TSP, with a term of automatic renewal unless terminated by one of the parties. *See* CC Ex. 5 at MTM000926.

Plaintiffs assert, but do not provide record evidence, that "TSPs often work exclusively or mostly for MTM and continue their contracts with MTM for many years." Pls.' Mem. at 21; *see Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003) (considering "whether [a subcontractor] had a business that could or did shift as a unit from one putative joint employer to another" as a relevant factor in the joint employment determination because "a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement" to evade wage laws "than a subcontractor that serves a single client"). But even if that is so, it does not tip this factor in Plaintiffs' favor. MTM's standard Service Agreement does not guarantee a minimum number of trips, and it provides that both MTM and the TSP are "free to enter into Agreements with other entities or persons to provide the same or similar services." CC Ex. 5 at MTM000914, 927. Neither side treats the agreement as exclusive. MTM contracts with a host of TSPs—more than 45, according to it 2015 subcontracting plan. *See generally* PEX T. And some TSPs provide transportation services for other clients. *See* DEX 16 at 34:15-19; DEX 44 ¶ 5; DEX 45 ¶ 5. MTM assumes as much. Its scheduling practices presume that TSPs

only have 50% of their vehicle capacity to provide NEMT services. *See* DEX 22 at 81:3–85:12, 95:10-14. The absence of exclusivity thus weighs against Plaintiffs. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 430–31 (S.D.N.Y. 2017) (granting summary judgment to putative joint employer because, among other reasons, subcontractor and putative joint employer were not in an exclusive agreement and there was evidence that employees worked on other projects outside of the joint employer's contract).

### d.    Ownership Interest or Shared Management

Plaintiff does not argue that MTM retains an ownership interest, direct or indirect, in any TSP. *See* Pls.' Mem. at 21. This factor, like all others discussed so far, does not support a finding of joint employment.

### e.    Ownership or Control Over the Drivers' Place of Work

The fifth *Salinas* factor asks whether the plaintiffs worked on premises controlled by the putative joint employer. *See Salinas*, 848 F.3d at 147. Here, that requires looking at who owned the vehicles used to deliver NEMT services. *See Young*, 2018 WL 279996, at *7; *McCoy*, 2022 WL 951996, at *9. The answer is clear: The TSPs own and supply the vehicles. In fact, under the Contracts, MTM cannot own any NEMT vehicle. *See* 2014 Contract ¶ C.3.1.5; 2015 Contract ¶ C.5.1.5. As for which entity controls the drivers' travel throughout the day, *McCoy*, 2022 WL 951996, at *9, MTM does not assign trips to specific drivers. The TSPs do. *See* Section IV(A)(3)(a), *supra*.

Plaintiffs argue that "MTM exercises control over those vehicles" by mandating certain specifications, requiring specific signage and safety equipment and via inspection. *See* Pls.' Mem. at 21–22. But as discussed, that authority is a function of the contractual requirements imposed on MTM by the District. *See supra* Section II(A)(2)(a). The "economic reality" of this situation

is that MTM does not control the vehicles, even if it imposes standards on their use. *See Mills*, 105 F.4th at 398 (emphasizing that the joint employment inquiry "centers on economic realities"); *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1180 (11th Cir. 2012) (noting that ownership is "relevant as an indicator of economic independence" and the fact that putative joint employer did not own drivers' vans weighed against a finding of joint employment).

f.    Shared Control Over Ordinary Employer Functions

The final *Salinas* factor looks to whether MTM and TSPs codetermined or allocated responsibility over functions ordinarily carried out by employers, such as the provision of tools and equipment, wages and salary responsibilities, hours tracking, and the maintenance of employment records. *See Salinas*, 848 F.3d at 147. The parties agree that TSPs pay the individual drivers and set their ultimate wage rates. As the court observed in its order denying class certification, the variation in pay practices across the various TSPs is "particularly striking." *Harris II*, 2020 WL 5702085, at *9 (citing exhibits). Though MTM's payment of TSPs on a per-trip basis may affect the wages that drivers inevitably receive, this alone cannot establish joint ownership. *See Jacobson*, 740 F. Supp. 2d at 692.

On the other hand, MTM does carry out some duties that are consistent with those of an ordinary employer. For example, MTM maintains certain records on drivers, including background checks, drug screenings, driving records and license information, CPR and first-aid training certificates, drivers' manifests and daily logs, and records of accidents or incidents involving drivers or other complaints from patients. DEX 3 at 77:3–88:13; PEX O at MTM000868; Pl.'s Stmt. ¶ 96 (undisputed); *see also* 2014 Contract ¶¶ C.3.2.3.3.4, C.3.2.3.10.3; 2015 Contract ¶¶ C.5.2.3.3.4, C.5.2.3.10.3. It also supplies the information that TSPs use to populate templates prepared by MTM to create schedules for drivers, and it provides the daily logs

drivers must complete for MTM to reimburse the TSP.  *See* CC Ex. 69 at MTM000819, 834–35, 841–42; *see also* PEX R at MTM003478.

But ultimately this type of record-keeping is not indicative of joint employment.  As to the former set of documents, they are an "extension" of MTM's quality control procedures.  *Jacobson*, 740 F. Supp. 2d at 692; *Zampos*, 970 F. Supp. 2d at 805.  MTM is required to maintain them under the Contract.  *See* 2014 Contract ¶¶ C.3.2.3.3.4, C.3.2.3.10.4.3, C.3.4.9.1; 2015 Contract ¶¶ C.5.2.3.3.4, C.5.2.3.10.4.3, C.5.4.9.1.  And as to the latter set, the fact that MTM supplies templates and information that enables scheduling of driver time is relatively weak evidence of joint employment, as that arrangement is just as likely for independent contractors.

On balance, given that MTM exercises no shared control over wages, little shared control over equipment and drivers' hours, and that the employment records retained are largely a function of MTM's quality control oversight, the court concludes that this factor disfavors joint employment.

### g.    Other Factors

In addition to the non-exclusive *Salinas* factors, the parties discuss other indicia that they deem relevant in determining whether MTM jointly employs NEMT drivers.  Because the court has concluded that *Salinas* factors favor MTM, it addresses these additional arguments only briefly.

The drivers argue that their work "was integral to the putative joint employer's business." Pls.' Mem. at 30 (citing *Zheng*, 355 F.3d at 68, and *Torres-Lopez v. May*, 111 F.3d 633, 640 (9th Cir. 1997)).  This is "relevant 'because a worker who performs a routine task that is a normal and integral phase of the [putative joint employer's] production is likely to be dependent on the [putative joint employer's] overall production process.'"  *Torres-Lopez*, 111 F.3d at 641 (quoting

*Rutherford Food Corp.*, 331 U.S. at 730). But courts should be cautious in considering such proof. "Interpreted broadly, this factor could be said to be implicated in *every* subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service." *Zheng*, 355 F.3d at 73. To determine whether employees' work is truly "integral," "industry custom . . . should be consulted," because "insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." *Id.* That is the case here and, apparently, within the industry. *See McCoy*, 2022 WL 951996, at *1 (broker in Maryland contracted out NEMT services to TSPs). By federal regulation and District contract, there is a compelled separation between MTM and TSPs. *See* 42 C.F.R. § 440.170(a)(4)(ii) (generally prohibiting brokers like MTM from providing non-emergency medical transportation services if there are certain conflicts of interest); 2014 Contract ¶¶ C.1(a), C.3.1.5; 2015 Contract ¶¶ C.1(a), C.5.1.5. MTM cannot provide transportation services, even if it wanted to. The fact that drivers are "integral" to MTM's business therefore does not carry the same weight that it might in a different case.

*Zheng* also considered "whether responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 73. This factor assesses whether employees "are tied to an entity" such as MTM "rather than to an ostensible direct employer" such as the TSPs, or work for the purported joint employer "only to the extent that their direct employer is hired by that entity." *Id.* There is record evidence that drivers did in fact provide NEMT services under the Contract while employed by multiple TSPs. *See* DEX 26, ECF No. 225-27, Response to Rogs. No. 8 & 9 (Plaintiff Robert Lesesne's "duties, schedule, and communication about both stayed consistent between Dip & Sons and The Galaxy because these features of the work were controlled by MTM."); DEX 29, ECF No. 225-30, Response to Rog. No. 4 (stating that

across three different TSPs, Plaintiff Richard Smith's duties as a driver were identical—"my job as a non-emergency medical transportation driver is to transport consumers to and from medical appointments"); *see also* DEX 31, ECF No. 225-32, Response to Rog. No. 5; DEX 35, ECF No 225-36, Response to Rog. No. 8; DEX 36, ECF No. 225-37, ¶ 2. This factor slightly favors joint employment but is offset by the fact that some TSPs have service contracts with businesses other than MTM.

*                *                *

Looking to the "circumstances of the whole activity," and construing the evidence in the light most favorable to MTM, the court cannot conclude that MTM is a joint employer of Plaintiff-drivers. *Salinas*, 848 F.3d at 142 (internal quotation marks omitted). The court therefore denies summary judgment on that certified question.

### B.     General Contractor-Subcontractor

Plaintiffs also move for summary judgment on the second certified issue: whether MTM is a general contractor to subcontractor TSPs for purposes of D.C. wage laws. The D.C. Minimum Wage Act, D.C. Code § 32-1012(c), and the D.C. Wage Payment and Collection Law, D.C. Code § 32-1303(5), provide that "[a] subcontractor, including any intermediate subcontractor, and the general contractor shall be jointly and severally liable to the subcontractor's employees" for violations of each Act and the Living Wage Act, D.C. Code § 2-220.01 *et seq*. The statutes do not define the terms "general contractor" or "subcontractor," so the court must "construe[] those terms 'in accordance with [their] ordinary or natural meaning[s].'" *Harris I*, 300 F. Supp. 3d at 246 (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)).

The Minimum Wage Act and the Wage Payment and Collection Law were both amended by the Wage Theft Prevention Amendment Act of 2014 to include joint and several liability for

general contractors and subcontractors.  *See* 61 D.C. Reg. 10,157 (Sept. 19, 2014).  The ordinary meaning of the term "general contractor" at the time of the statute's enactment, *see Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 873–74 (1999), is "[s]omeone who contracts for the completion of an entire project, including purchasing all materials, hiring and paying subcontractors, and coordinating all the work," *General Contractor*, Black's Law Dictionary (10th ed. 2014); *see also General Contractor,* Oxford English Dictionary Online, https://perma.cc/5FAL-SNX5 (last visited Apr. 9, 2025) ("A person who or business which contracts to undertake the entirety of a project and is responsible for coordinating all aspects of it, including acquiring materials and hiring subcontractors.").  As the D.C. Court of Appeals has stated, "[g]eneral contractors typically are not the ones on the ground swinging the hammers, but instead insure, guarantee, and supervise the work of subcontractors."  *C.A. Harrison Companies LLC v. Evans*, 266 A.3d 979, 983 n.4 (D.C. 2022) (citing *General Contractor*, Black's Law Dictionary (10th ed. 2014)).

A "subcontractor" is "[s]omeone who is awarded a portion of an existing contract by a contractor, esp. a general contractor."  *Subcontractor*, Black's Law Dictionary (10th ed. 2014).  "For example, a contractor who builds houses typically retains subcontractors to perform specialty work such as installing plumbing, laying carpet, making cabinetry, and landscaping—each subcontractor is paid a somewhat lesser sum than the contractor receives for the work."  *Id.*; *see also Subcontractor*, Oxford English Dictionary Online, https://perma.cc/NDP2-9QBL (last visited Apr. 9, 2025) ("A person who or company which undertakes work under a subcontract, or (more generally) undertakes work on a particular part of a larger project.").  The various agreements among the District, MTM, and the TSPs, and the structure of the parties' relationships, are consistent with a general contractor-subcontractor arrangement.

MTM has undertaken to deliver NEMT services to eligible District residents and is responsible for coordinating all aspects of the NEMT program. The Contracts' "Work Statement" provides that the District was "seeking a transportation broker . . . to manage and administer the District's non-emergency Transportation Services . . . for the District's" eligible Medicaid recipients. 2014 Contract ¶ C.1; 2015 Contract ¶ C.1. The Contracts in turn, define "broker" as:

> An entity or company which assists Medicaid clients obtain transportation service options by matching [Medicaid] Recipients with appropriate Transportation Providers through a central trip request and administrative facility. The entity also recruits and contracts with Transportation Providers, performs payment administration, gate keeping, trip assignments, quality assurance, administrative oversight and reporting. The entity the District has successfully negotiated an agreement for the provision of required tasks.

2014 Contract ¶ C.1.2.6; 2015 Contract ¶ C.3.7. Among the "required tasks" are to "provide the oversight and monitoring of the day-to-day operations necessary for the delivery of [NEMT] services," "provide [NEMT] services to Eligible Recipients in the District," and "administer [NEMT] services in accordance with applicable federal laws . . . and District laws . . . ." 2014 Contract ¶¶ C.3.1.1– C.3.1.3 (under the heading "General Broker Responsibilities"); *see also* 2015 Contract ¶¶ C.5.1.1–C.5.1.3 (under the heading "*General Contractor* Responsibilities" (emphasis added)). As these "required tasks" demonstrate, MTM did not contract with the District merely to "manage and administer" the NEMT program; it contracted to "provide" and "deliver" NEMT services as a whole. Its role is therefore consistent with that of a general contractor.

This conclusion is consistent with how the D.C. Court of Appeals has understood the term "general contractor" in a different context. In *C.A. Harrison Companies v. Evans*, the court addressed whether a business served as a "general contractor" on a home improvement project under the District's Municipal Regulations. *See* 266 A.3d at 983–85 (citing D.C. Mun. Regs., tit.

16, § 800.1). Under D.C. law, "a general contractor who oversees a home improvement project and is charged with the actual delivery of a finished project is subject to" the regulation. *Id.* at 983 (internal quotation marks omitted). The plaintiff argued that since it was "neither hired nor paid to serve as the general contractor," it could not be held liable as one. *Id.* at 983–84. The Court of Appeals disagreed, taking a functional approach in determining whether an entity is a general contractor. It looked to whether the entity "assumed the authority to hire and supervise subcontractors, and took on the responsibility for final delivery." *Id.* at 984. Then, it concluded that the plaintiff was a general contractor because it "contracted directly with subcontractors," "exercised supervisory authority over the work performed by the subcontractors," and "[m]ost importantly," "took on the responsibility of delivering the final product and completing the project." *Id.* at 984.

MTM falls comfortably within this functional understanding of a general contractor. For example, MTM must "recruit, solicit, and select Transportation Providers" amongst a licensed pool. 2014 Contract ¶ C.3.2.1.1; 2015 Contract ¶ C.5.2.1.1. MTM must contract directly with companies that own and operate vehicles and employ drivers to transport Medicaid patients. *See* 2014 Contract ¶ C.3.2.1.4; 2015 Contract ¶ C.5.2.1.4; CC Ex. 5. Further, and as is readily apparent throughout the Contracts, MTM then "supervises" the TSPs, even if that supervision does not rise to the level of joint employment. *See* 2014 Contract ¶ C.1(e) (stating that MTM shall "[m]onitor the overall delivery of Transportation Services . . . to ensure the consistent delivery of quality [NEMT] services"); 2015 Contract ¶ C.1(e) (same). And, ultimately, it is MTM that has taken on the responsibility of "delivering" NEMT services to eligible District residents. *See* 2014 Contract ¶ C.3.1.2; 2015 Contract ¶ C.5.1.2 (stating that the "General Contractor Responsibilities" include "provid[ing] [NEMT] services to Eligible Recipients in the District").

Other aspects of the Contracts underscore MTM's status as a general contractor. The Contracts require MTM to pay TSPs with the funds it receives from the District. *See* 2014 Contract ¶ C.3.1.9(e); 2015 Contract ¶ C.5.1.11(f). This practice is consistent with the ordinary understanding that subcontractors are generally paid a portion of the funds received by the general contractor for a project. *See Subcontractor*, Black's Law Dictionary (10th ed. 2014). The Contracts also require that each Service Agreement include specific provisions incorporating requirements as to vehicles, driver qualifications, conduct standards, and other areas. *See* 2014 Contract ¶ C.3.2.2.1; 2015 Contract ¶ C.5.2.2.1. This, too, is consistent with subcontracting practices. "The general purpose behind [flow down or incorporation by reference] provisions is to bind the subcontractor to the contractor in the same manner and to the same extent (subject of course *to the scope of the subcontractor's work*) as the contractor is bound unto the owner." *See* 1 Philip J. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor Construction Law* § 3:64 (2024 ed.) (emphasis added). *See also Subcontractor*, The Free Dictionary, https://perma.cc/Z2NP-4P78 (last visited Apr. 9, 2025) ("Subcontractors sign contracts with the general contractor that typically incorporate the agreement between the general contractor and the owner.").

Though "calling a thing by a name does not make it so," *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n.*, 429 U.S. 167, 174 (1976), the text of the Contracts drives the point home even further. The Contracts' language refers repeatedly to MTM as "Contractor" or "General Contractor" and the TSPs as subcontractors. *See, e.g.*, 2015 Contract ¶ C.5.1 (section titled "General Contractor Responsibilities"). For instance, the District "may impose sanctions against the Contractor for poor performance or noncompliance with Contract terms by the Contractor or its *subcontracted* Transportation Providers." 2014 Contract ¶ G.9.6 (emphasis added); 2015 Contract ¶ G.12.5 (similar). The 2015 Contract makes things even more explicit:

In discussing the "Conditions for Federal Financial Participation," it states that MTM must assure that "its subcontractors, *including transportation providers*," are not barred from participation in federal assistance programs and notify the District if anything changes. 2015 Contract, ¶¶ H.12.12, H.12.15.1–H.12.15.2 (emphasis added).

The Contracts also require MTM to submit a "subcontracting plan." The 2015 Contract provides that, "[f]or contracts in excess of $250,000, at least 35% of the dollar volume shall be subcontracted to certified small business enterprises[.]" *Id.* ¶ H.9.1.1. In that case, MTM must submit a "subcontracting plan" in accordance with this requirement. *Id.* ¶ H.9.2. MTM did indeed submit such a "subcontracting plan," indicating that it understood "by law" that it "must subcontract 35% of the total dollar volume of this contract to certified" small business enterprise subcontractors, including those that "provide attendant and/or transportation services." *See* PEX T at OCP000484. MTM's subcontracting plan lists the names and contact information of over 45 TSPs under "subcontractor information" headings. *See* Pls.' Stmt. ¶ 107 (undisputed) (citing PEX T). Further, and significantly, MTM was required to "include in any subcontract for $15,000 or more a provision requiring the subcontractor to pay its employees who perform services under the contract no less than the current living wage rate" and include a wage fact sheet. 2015 Contract, ¶¶ H.8.3, H.8.5. MTM did just that in its Service Agreements. *See* CC Ex. 5 at MTM000934–936.

MTM advances two main arguments in opposition. First, it asserts that treating it as a "general contractor" under D.C. law is preempted by federal statute and regulations. *See* Def.'s Opp'n at 51–54.[9] Second, it states that its role as a broker is fundamentally different than that of a general contractor. According to MTM, the Contracts prohibit it from subcontracting its

---

[9] The court need not consider this argument with respect to a "joint employer" finding because it has found that MTM does not so qualify.

responsibilities, bar it from providing transportation while simultaneously acting as a broker, and are non-exclusive. *See id.* at 54–60.

The court dispenses with the first argument quickly. The "starting assumption" in any preemption analysis is that "federal law does not override 'the historic police powers of the States,' absent the 'clear and manifest' intent of Congress." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 346 (D.C. Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 400 (2012)). Such intent may be shown explicitly, via an express statutory provision, or implicitly, through the substantive nature and reach of the federal regulatory scheme enacted by Congress. *Id.* at 346. Conflict preemption, a form of implied preemption, exists where "compliance with both state and federal law [is] impossible," or where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 346–47 (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)).

MTM fails to demonstrate that D.C. wage laws create such "impossibility" or "obstacle." MTM says it cannot be a "general contractor" to "subcontractor" TSPs under D.C. wage laws because that "type of relationship . . . is explicitly prohibited under federal law." Def.'s Opp'n at 53. It relies on 42 U.S.C. § 1396a(a)(70)(B) and 42 C.F.R. § 440.170(a)(4)(ii). *Id.* at 51. But, if anything, those provisions underscore the general contractor-subcontractor relationship between MTM and TSPs. The statute allows a state to establish an NEMT brokerage program with a private entity so long as the NEMT broker complies with certain conflict-of-interest regulations. 42 U.S.C. § 1396a(a)(70)(B). The regulation, in turn, prohibits an NEMT broker from "making a referral or subcontracting to" a TSP if "[t]he broker has a financial relationship with" the TSP or "[t]he broker has an immediate family member . . . that has a direct or indirect financial relationship with" the TSP. 42 C.F.R. § 440.170(a)(4)(ii)(A)–(B). The flip side, of course, is that so long as

there is no such conflict, then the broker may "refer" or "subcontract" transportation services. Federal law therefore does not preempt a finding that MTM is a general contractor for purposes of D.C. wage laws.

MTM's second argument is a rehash of one made in its motion to dismiss. It maintains that it is "a broker and not a general contractor that has a right to subcontract part of its contractual responsibilities," because the Contracts "specifically obligate[] MTM to provide distinctly different services than the TSPs." Def.'s Opp'n at 56–57. In particular, the Contracts state that MTM "shall not own or operate any vehicle to be used for transport within the [NEMT] program," so it cannot be said to "subcontract" out those services. 2014 Contract ¶ C.3.1.5; 2015 Contract ¶ C.5.1.5. But as the court found in *Harris I*, just because MTM "performs a 'different' function than the transportation companies does not disqualify it from being a general contractor." *Harris I*, 300 F. Supp. 3d at 247. Indeed, imagine a home renovation agreement between a homeowner and a contractor. The agreement contains a provision that any plumbing work must be done by a licensed plumber. The contractor is not a licensed plumber, so it enters into a subcontract with one to perform those services. Just because the contractor cannot perform plumbing services does not mean it is not a general contractor in relation to the plumber—it is still tasked with the overall delivery of the home renovation. So too here. Just because the Contracts prohibit MTM from providing transportation services does not mean it is not responsible for their ultimate delivery— that is precisely MTM's responsibility under the Contracts. This is consistent with the ordinary understanding of a general contractor-subcontractor relationship. *See Subcontractor,* Black's Law Dictionary (10th ed. 2014) ("[A] contractor who builds houses typically retains subcontractors to perform specialty work such as installing plumbing, laying carpet, making cabinetry, and landscaping[.]").

MTM also points to a provision in the Contracts that disallows MTM from "subcontract[ing] any portion of the Broker's requirements contained in this contract." 2014 Contract ¶ C.3.1.5; *see* 2015 Contract ¶ C.5.1.5 (similar). MTM takes this to mean that it cannot be a general contractor, because it cannot "subcontract" its work. But MTM's reading makes a mountain out of a molehill. It depends on a single sentence in one clause in a 187-page contract. And it cannot possibly mean what MTM says. The sentence at issue appears in the same clause that bars MTM from owing or operating any vehicle used for NEMT services. That juxtaposition is important because it distinguishes the provision of transportation from MTM's "requirements," which are broadly to "manage and administer" the NEMT program. 2014 Contract ¶ C.3 (subheading titled "Requirement"); 2015 Contract ¶ C.5 (subheading titled "Requirements"). Properly read, what the provision means is that MTM cannot subcontract out its management and administrative duties. That does not mean that MTM does not subcontract out the transportation services. The Contracts expressly contemplate it will do just that. *See* 2015 Contract ¶ H.9.1.1 (provision concerning subcontracting thresholds for small businesses); *see also Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 620 (D.C. Cir. 2023) (underscoring that contracts must be "read as a whole" to avoid rendering any provision a nullity).

As a last-ditch effort, MTM points to the fact that TSPs can determine whether to accept trips, and indeed can decline assigned trips, and that the Service Agreements are non-exclusive. *See* Def.'s Opp'n at 55, 58. According to MTM, the Service Agreements "do not entail a commitment by either party to provide or perform any work," *id.* at 55, and the "ability to self-select work is antithetical to the common practice of a general contractor specifically directing work to a subcontractor," *id.* at 58. But the general contractor-subcontractor relationship is not defeated just because a TSP can work for someone else and can refuse work. That hardly sets

TSPs apart from other subcontractors, who routinely work for multiple general contractors and decline work for any number of reasons.  Given the D.C. Court of Appeals' functional approach to what it means to be a general contractor, *see C.A. Harrison Companies LLC*, 266 A.3d at 983–85, non-exclusivity and discretion in an agreement cannot, without more, transform a subcontractor into something else.

Accordingly, the court grants summary judgment to Plaintiffs on the second certified issue and concludes that MTM is a "general contractor" and the TSPs are "subcontractors" for purposes of D.C. wage laws.

## V.  CONCLUSION AND ORDER

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment, ECF No. 222, is granted in part and denied in part.

Dated:  April 11, 2025

Amit P. Mehta
United States District Judge